UNITED STATES of America,
Appellee,

v.

John WALSH, Defendant–Appellant.

No. 98–1648.

United States Court of Appeals,
Second Circuit.

Argued: June 30, 1999.

Decided: Oct. 19, 1999.

Paul J. Campana, Assistant United States Attorney for the Western District of New York, Buffalo, NY (Denise E. O'Donnell, United States Attorney, of counsel), for Appellee.

Mark R. Uba, Connors & Vilardo, LLP, Buffalo, NY (Terrence M. Connors, of counsel), for Defendant–Appellant.

Before: KEARSE, STRAUB, and POOLER, Circuit Judges.

STRAUB, Circuit Judge:

Defendant John Walsh appeals from a judgment entered following a jury trial in the United States District Court for the Western District of New York (John T. Curtin, *Judge*), convicting him on three counts of violating 18 U.S.C. § 242, which makes it a criminal act to willfully deprive a person of rights protected by the Constitution or laws of the United States, while acting under color of law.

On appeal, Walsh raises several challenges to his conviction. First, he contends that his conviction violated his Fifth and Sixth Amendment rights in that the indictment under which he was found guilty was insufficient in its notice and particularity, failed to ensure that he was not convicted on evidence not presented to the grand jury, was multiplicitous and duplicitous, and failed to protect him against double jeopardy. Given these deficiencies in the indictment, Walsh argues that the District Court should have dismissed the indictment pretrial or, in the alternative, that the District Court abused its discretion in denying his pretrial motion for a bill of particulars. Second, Walsh argues that the evidence presented at trial was insufficient to establish a constitutional violation under § 242 in that it failed to demonstrate that: (1) his alleged actions constituted "punishment" prohibited by the Eighth or Fourteenth Amendments; (2) he caused an injury of constitutional dimension; or (3) he was acting "under color of law" at the time of the alleged incidents. Third, Walsh argues that the evidence presented at trial was insufficient to establish his guilt beyond a reasonable doubt. Finally, Walsh contends that the court's instruction to the jury was erroneous in several respects.

Having considered all the arguments, we affirm.

## BACKGROUND

On January 4, 1996, a grand jury returned a one-count indictment against Lieutenant John Walsh, a Corrections Officer at Orleans County Jail in Albion, New York. The indictment charged Walsh with a single violation of 18 U.S.C. § 242, for violating the Eighth Amendment right of Norvin Fowlks, an inmate at that facility, to be free from cruel and unusual punishment. The indictment alleged that Walsh stepped on Fowlks's penis on a date between January 4, 1991 and March 8, 1991, while Fowlks was inside a jail cell, causing him unnecessary and wanton pain.

Walsh moved, *inter alia*, to dismiss the initial indictment due to insufficiency of proof before the grand jury and, in the alternative, moved for a bill of particulars. Upon the recommendation of Magistrate Judge Hugh B. Scott, the District Court denied those motions.

On May 2, 1996, the same grand jury returned a first superseding indictment

adding two additional counts under § 242. Count I of the first superseding indictment remained unchanged. Count II alleged that, in violation of the Eighth Amendment, Walsh stepped on Fowlks's penis sometime between May 26, 1992 and December 1, 1992, while Fowlks was in a jail cell, causing unnecessary and wanton pain. Count III alleged that, again in violation of the Eighth Amendment, Walsh stepped on Fowlks's penis sometime between May 26, 1992 and July 22, 1992, while Fowlks was lying on the floor of a jail cell, causing him unnecessary and wanton pain.

Walsh again moved, *inter alia*, to dismiss the first superseding indictment arguing that the three counts in the indictment charged essentially identical acts occurring within broad and sometimes overlapping time periods and, therefore, that the indictment: (1) failed to provide him with adequate notice of the conduct charged; (2) failed to protect him against double jeopardy; and (3) was fatally multiplicitous and/or duplicitous. In the alternative, Walsh moved for a bill of particulars.

In response to Walsh's motion, the government submitted the affidavit of Assistant United States Attorney Paul J. Campana ("Campana Affidavit"), detailing the discovery that had been provided to the defendant before the motion to dismiss was filed. In particular, the government: (1) identified the names of each witness to each count; (2) explained the rationale for each given date range for the alleged events; and (3) specified the location of each alleged incident, and the fact that Counts I and II allegedly occurred in the same cell, but Count III occurred in a different cell. In a written opinion, the District Court adopted the second report

of the Magistrate Judge recommending the denial of Walsh's motion to dismiss the first superseding indictment and the request for a bill of particulars.

On August 21, 1997, the same grand jury returned a second superseding indictment (the "Indictment"), which changed the wording of Count I.[1] The defendant was tried on the Indictment.

The evidence, viewed in the light most favorable to the government, showed the following:

As to Count I of the Indictment, the government offered the testimony of former Orleans County Corrections Officer Joseph Kujawa. Kujawa testified that one night Walsh was walking in front of him in the ground-floor booking area, a narrow corridor flanked by four holding cells on one side and a booking room on the other. Fowlks was in the cell at the far end of the corridor. This cell was different from the others because it had no toilet-sink fixture. Fowlks was kept in that cell often as punishment for making excessive noise, disturbing other prisoners, or other misconduct.

Kujawa heard Fowlks shout repeatedly, "Big Jack, give me a cigarette." Walsh, who was six feet, two inches tall and weighed over 300 pounds, walked to the front of Fowlks's cell and said, "[A]ll right Norvin, you know what you got to do, on your knees ." Fowlks, who was naked inside the cell, dropped to his knees. Walsh then said, "[O]kay, put your dick on the bars," and Fowlks placed his penis on a horizontal steel plate of the bars. Walsh then grabbed two vertical cell bars with his hands, raised his right foot, and placed it on Fowlks's penis for a few seconds, as if he were climbing a ladder. Fowlks

---

1. Count I of the first superseding indictment charged that by his conduct, Walsh violated Fowlks's right "not to be subjected to cruel or unusual punishment." Count I of the second superseding indictment stated that by his conduct, the defendant deprived Fowlks "of a right secured to him by the Constitution and laws of the United States." The change in the language reflected the fact that at certain times during the time period alleged in Count I, unspecified in the record before us, Fowlks was incarcerated as a pretrial detainee, not as a post-judgment inmate, thereby rendering the Fourteenth Amendment, as opposed to the Eighth Amendment, the applicable constitutional provision. *See* discussion below.

screamed and "[h]is mouth was wide open, his eyes were almost, you know, bugging out of his head, you could [see] the white all [the] way around his eyes." Fowlks's scream was "as loud or louder" than the screams Kujawa had heard at the scenes of motor vehicle accidents he had investigated. Walsh then gave Fowlks a cigarette.

Kujawa testified that he did not report the incident initially because he would have had to report it to the warden, Captain Charles Dingman, and he was afraid of retaliation because the warden and Walsh were good friends. Moreover, Kujawa knew that the warden also "tormented" Fowlks and "it was a game between [Walsh and the warden] to torment Norvin." For example, the warden would say to Fowlks, "[S]uck your dick for a cigarette," and Fowlks would, and the warden would give him a cigarette. Kujawa also did not call for medical attention after the incident because Fowlks stopped screaming immediately after the incident and began smoking the cigarette so that "whatever pain there was seemed to me to be subsiding."

Kujawa remembered that the incident he witnessed occurred after January 3, 1991, the day his classes resumed from holiday break at the Police Academy. The latest the incident could have occurred was March 10, 1991, the day Kujawa resigned to join the Village of Medina police force. Through other deductions, Kujawa was further able to conclude that the incident occurred on one of seven days when he did not have classes at the academy, between January 18 and February 19, 1991.

Corrections Officer Paul Sidari and former Corrections Officer Timothy Bourke testified as to Count II of the Indictment. Both officers testified that, in 1992, they saw Walsh step on Fowlks's penis as Fowlks stood in the same ground-floor

holding cell where Kujawa saw Walsh assault Fowlks in 1991.

Sidari heard Fowlks ask Walsh for a cigarette. Walsh was holding a cigarette and slapped the clenched fist of one hand into the open palm of the other and said to Fowlks, "[W]ho am I? Who am I?" Fowlks yelled back, "hammer Jack, hammer Jack." Walsh then told Fowlks to "put his dick on the bars." Fowlks, in a standing position, placed his penis on a horizontal steel plate on the bars. Walsh then grabbed two vertical cell bars with his hands, raised his right foot, placed it on Fowlks's penis for "[s]econds,"[2] while rocking up and down with his foot in that position. Fowlks "screamed in pain" during the incident and "rolled back into his cell" after Walsh removed his foot. Sidari did not see Bourke during the incident but saw him standing in the hall of the booking area just before and just after the incident.

Bourke described the assault much as Sidari did. He remembered Fowlks, in a standing position, begging for a cigarette and Walsh saying, "[Y]ou want a smoke, you know what you have to do. Put your dick on the bars." Fowlks did this, and the defendant placed his foot on Fowlks's penis. Fowlks screamed in pain during and after the incident, which Bourke testified lasted "a second." The defendant then threw Fowlks a cigarette and was laughing. Bourke said nothing about the defendant slapping his fist or Fowlks calling him "hammer Jack." Bourke did not seek medical attention for Fowlks because "he seemed fine" after the assault. Both officers testified that there were no other inmates present during the incident.

Neither Sidari nor Bourke could remember the specific date of the incident. However, the government presented evidence that Fowlks was in the jail from May 26, 1992 until January 1993, Bourke testified at trial that the incident occurred in the

---

**2.** Sidari previously testified before the grand jury that the incident could have lasted as long as ten seconds.

spring or fall of 1992,[3] and Sidari remembered that it occurred between May 26 and December 1, 1992.

According to the government, the only witness to the assault alleged in Count III of the Indictment was Dwayne Holloman, an inmate at the jail from December 31, 1991 through January 31, 1992 and from February 18, 1992 through July 22, 1992. Holloman was unable to specify when the alleged incident happened, other than to say it happened in 1992.[4] According to prison records, however, Holloman and Fowlks only overlapped between May 26 and July 22 in 1992. Also, Holloman stated that Fowlks had a bandage on his hand when the incident occurred, and Fowlks had been to Erie County Medical Center on June 5, 1992 to have staples removed from a stab wound he suffered to his hand four weeks earlier.

Holloman stated that one day while he was in the booking area sweeping the floor, he saw Fowlks in one of the holding cells that had a toilet-sink fixture, as opposed to the cell described in Counts I and II, which did not. While Fowlks was lying on his back on the floor inside the cell, Walsh stood over Fowlks and stepped on his penis, "mashing" it as one might extinguish a cigarette. Holloman heard Fowlks curse at Walsh in a loud voice as the defendant stepped on him. Holloman spoke with Fowlks a few days after the incident and asked him if it had hurt. Fowlks told him that it did not hurt "too much."

Fowlks, who has a long history of mental disturbance, testified as to all three events charged. He was unable, however, to specify a date, or a time of day, between 1991 and 1993 when the incidents occurred. He testified that Holloman witnessed an incident during which Fowlks was lying on his stomach in a cell and, in contrast to Holloman's testimony at trial, that the incident did hurt. He further testified that some of the "deputies" witnessed some of the incidents and that another inmate, Joe Capeman, was present during "the winter" incident. There was no other evidence presented that Capeman was present during any of the incidents. Although Sidari and Bourke testified that Fowlks was standing during the assault they witnessed, Fowlks testified that he was kneeling during two of the three incidents, and lying on his stomach during one incident.

Walsh testified in his own defense and denied the allegations against him. Walsh produced Orleans County Jail log books that did not reflect that Fowlks was in the holding-cell area where the government's witnesses allegedly saw the incidents take place at the times when they allegedly occurred. Walsh also offered the testimony of Orleans County Jail physician John P. Fernandez, M.D., who testified that, although Fowlks requested medical attention on many occasions for minor complaints during his incarceration, he never complained of any injuries to his penis. Dr. Fernandez also stated that if Walsh, weighing over 300 pounds, had assaulted Fowlks in the manner alleged, Fowlks would have suffered some kind of physical injury.

On September 30, 1997, the jury returned a verdict of guilty on all three counts of the Indictment. The District Court issued a written opinion on July 14, 1998, denying the defendant's post-trial motion for a judgment of acquittal or, in the alternative, to dismiss the Indictment or grant a new trial. *See United States v.*

---

3. Bourke gave prior inconsistent testimony before the grand jury that the assault occurred in 1991 (prior to the dates alleged in the Indictment), and he told a police investigator that it took place in May of 1993 (after the dates alleged in the Indictment).

4. Holloman had stated earlier to the Federal Bureau of Investigation that the incident happened in late 1991 or early 1992. On cross-examination, he stated that the incident took place around the time of a December 31, 1991 trespassing arrest (outside the time period alleged in Count III).

*Walsh,* 27 F.Supp.2d 186 (W.D.N.Y.1998). In a judgment of conviction dated November 9, 1998, the District Court sentenced the defendant to 24 months on each of the three counts, to be served concurrently, as well as a two-year term of supervised release and a $150 special assessment.

This timely appeal followed.

## DISCUSSION

### I. *Fifth and Sixth Amendment Claims*

#### A. *Sufficiency of the Indictment*

Walsh claims that the Indictment was insufficiently particular to provide him with adequate notice of the charges, allow him to differentiate the counts, protect him against double jeopardy, and ensure that he was not convicted on evidence not presented to the grand jury. We disagree.

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." This requirement performs three constitutionally required functions: It fulfills the Sixth Amendment right "to be informed of the nature and cause of the accusation;" it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury. *See United States v. Silverman,* 430 F.2d 106, 110 (2d Cir.) (listing these three functions), *modified,* 439 F.2d 1198 (2d Cir.1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971).

■ It is well-established that "[a]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992).[5] The Indictment Clause of the Fifth Amendment "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Abrams,* 539 F.Supp. 378, 384 (S.D.N.Y.1982). However, we have consistently upheld indictments that "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

■ The Indictment in this case does more than simply track the language of 18 U.S.C. § 242, which provides penalties for any person who "under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person ... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." Each count in the Indictment names the victim of the assault, specifies the manner in which each assault occurred and the time period in which the assault is alleged to have occurred (Count I: between January 4 and March 8, 1991; Count II: between May 26 and December 1, 1992; and Count III: between May 26 and July 22, 1992). Although the periods specified in Counts II and III overlap, Count III differentiates the assault it alleges by speci-

---

**5.** Walsh emphasizes that his double jeopardy concerns arise primarily from a fear that he was punished twice for the same act in this prosecution, not that he may be prosecuted again for the same acts in a subsequent prosecution. In fact, the risk of double jeopardy in a subsequent prosecution is always part of the analysis of the sufficiency of the indictment, because minimizing that risk is a primary aim of the sufficiency requirements. Accordingly, we address that issue in this subsection. The multiplicity/duplicity arguments Walsh raises are duplicative of the argument that he was subject to double jeopardy in this prosecution. Accordingly, we address them as one issue in the multiplicity/duplicity subsection below.

fying the victim's body position during the assault. These factual specifics are sufficient to provide the defendant with adequate notice of the charges, allow him to prepare his defense, and ensure that he was not prosecuted based on evidence not presented to the grand jury.

Walsh's main contention, that he was unable to distinguish the counts because of the broad and sometimes overlapping dates, is unavailing when the Indictment as a whole is examined. *See United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986) (evaluating indictment as a whole). Count I covers a time period not included in Counts II or III. Though Counts II and III overlap in time, they are distinguished by the body position of the victim in the cell.[6]

Although the Indictment is not a model of clarity, "[r]ecognizing that particular facts needed in particular cases are obtainable by bills of particulars or discovery, we have repeatedly refused, in the absence of any showing of prejudice, to dismiss ... charges for lack of specificity." *United States v. McClean*, 528 F.2d 1250, 1257 (2d Cir.1976) (citation and internal quotation marks omitted). The absence of demonstrated prejudice distinguishes this case from those on which Walsh relies.

For example, the indictment at issue in *United States v. Panzavecchia*, 421 F.2d 440 (5th Cir.1970), *cert. denied*, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286 (1971) was completely devoid of any factual particularity. Indeed, the three counts of the indictment were "identically worded." *Id.* at 441. In *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), the indictment charged the defendants with refusal to answer questions "pertinent to the question under [congressional] inquiry" under 2 U.S.C. § 192, yet failed to specify the subject matter under congressional inquiry. *Id.* at 751–52, 768, 82 S.Ct. 1038. The indictment at issue in

*United States v. Tomasetta*, 429 F.2d 978, 979 n. 1, 980–81 (1st Cir.1970), failed to even name the victim of an extortion count or the means by which the threat was made; the only information provided, other than the language of the statute, was the approximate date and city in which the conduct was to have occurred. By contrast, the indictment under which Walsh was convicted was more specific than those at issue in *Panzavecchia* and *Tomasetta*, allowing him to distinguish the counts on their face, and was not devoid of a key factual element crucial to the preparation of his defense, as in *Russell.*

■ Moreover, Walsh was provided with further details during discovery to aid him. While a bill of particulars or discovery cannot save a "defective indictment," *Panzavecchia*, 421 F.2d at 442, where the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense. *See Stavroulakis*, 952 F.2d at 693; *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

The Campana Affidavit, which summarizes the discovery provided to the defendant: (1) states that the names of the witnesses to each count were given to the defendant; (2) explains the rationale for each given date range alleged in the indictment; (3) specifies the location of each alleged incident—namely, that the incidents alleged in Counts I and II occurred in the same cell lacking a toilet-sink fixture and the incident alleged in Count III occurred in a different cell on the same floor with a toilet-sink fixture. Such particularities sufficiently protected Walsh's rights.

---

6. While Walsh is correct that the description of Fowlks's body position in Count II does not *per se* preclude the description in Count III, the distinction is sufficient to alert Walsh that different incidents are alleged.

### B. *Multiplicity/Duplicity of the Indictment*

In a related claim, Walsh asserts that the Indictment was multiplicitous and/or duplicitous. Again, we find this claim without merit.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir.1999). Conversely, "[a]n indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992).

We may consider the record as a whole in determining whether an indictment is in fact multiplicitous or duplicitous. *Cf. United States v. Stanfa,* 685 F.2d 85, 88 (3d Cir.1982) (noting that a district court may wait until the close of the government's case before deciding whether counts fail the multiplicity test); *United States v. Miller,* 26 F.Supp.2d 415, 422–23 (N.D.N.Y.1998) (concluding that where an indictment is not multiplicitous on its face, the court should await trial on the facts to make its determination) (citing *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 224, 73 S.Ct. 227, 97 L.Ed. 260 (1952)).

Walsh contends that the Indictment was multiplicitous because Counts II and III required proof of precisely the same set of facts and so he cannot be sure that he was not punished more than once for the same offense. First, even on its face, the Indictment is not clearly multiplicitous. As explained above, Counts II and III are at least somewhat distinguished from one another by the body position of the victim, as well as by different, but overlapping time frames.

Moreover, the evidence presented at trial confirmed that: (1) the cells in Counts II and III were different; (2) the incident alleged in Count III occurred after June 5, 1992; and (3) Fowlks was standing during the incident alleged in Count II, while he was lying on the floor during the incident alleged in Count III. While Walsh is correct that the jury did not have access to some of the discovery provided by the government, it obviously had access to the evidence at trial which, if the jury chose to accept the government's case, ensured that it could differentiate the charges in the Indictment.

Walsh also contends that Count II of the Indictment was duplicitous because Sidari and Bourke, the witnesses offered by the government as to Count II, may have been testifying about two different events. Again, viewing the evidence in the record, it is clear that, although Sidari's and Bourke's testimony was not identical, they were testifying as to the same event. Both officers testified at trial that in 1992 they saw the defendant step on Fowlks's penis while Fowlks was standing in the ground-floor holding cell without a toilet-sink fixture. Sidari also recalled seeing Bourke just before and just after the incident he witnessed. The inconsistencies between their testimonies—such as whether it lasted one second or ten—are simply inconsistencies that occur in almost any trial testimony due to the limits of human observation or memory.

Walsh also argues that the jury may have improperly relied on the testimony of Dwayne Holloman, who the government offered as a witness to the events alleged in Count III, in convicting him of the charges in Count II, thereby rendering Count II duplicitous. Again, however, an examination of the testimony at trial reveals that Holloman clearly testified as to a different event than Sidari and Bourke. First, Holloman testified that the cell in which he saw Walsh assault Fowlks had a toilet-sink fixture, as opposed to the one described by Sidari and Bourke. Second, Holloman testified that Fowlks was lying on the ground during the assault, whereas Sidari and Bourke saw Fowlks standing. Finally, only Holloman observed a band-

age on Fowlks's hand when the incident he witnessed occurred, and Fowlks had been to Erie County Medical Center on June 5, 1992 to have staples removed from a stab wound he suffered to his hand four weeks earlier.

Given these distinctions in the Indictment, as further clarified by the evidence at trial, the Indictment was neither multiplicitous nor duplicitous, and Walsh's conviction under the Indictment did not violate principles of double jeopardy.

### C. *Bill of Particulars*

■ A denial of a bill of particulars is reviewed for an abuse of discretion. *See United States v. Barnes*, 158 F.3d 662, 665–66 (2d Cir.1998). We find the District Court did not exceed its allowable discretion in denying Walsh's request.

■ A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). As described above, the Indictment was satisfactory in this respect.

■ Furthermore, a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means. *See id.* (denying a request for a bill of particulars in part because the defendants were provided with considerable evidentiary detail outside of the indictment); *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir.1984).

As detailed above, at the time of the District Court's decision to deny the bill of particulars, the government had provided Walsh with details that allowed him to differentiate the charges sufficiently and, therefore, present his defense adequately, rendering a bill of particulars unnecessary. While it is true that the discovery provided did not limit the jury's consideration of the evidence as a bill of particulars would, *cf. United States v. Glaze*, 313 F.2d 757, 759 (2d Cir.1963), such a limitation was not necessary where the evidence presented in discovery adequately differentiated the charges and, therefore, the defendant has not demonstrated actual surprise resulting from the evidence that was presented at trial. *Cf. Barnes*, 158 F.3d at 665–66 (concluding that any error in the denial of a bill of particulars was harmless where the defendant could not demonstrate that he was taken by surprise by the evidence presented at trial and that such surprise prejudiced his defense).

### II. *Eighth and Fourteenth Amendment Claims*

Walsh argues that his conduct, even as alleged by the government, does not rise to the level of a constitutional violation. We disagree.

■ Preliminarily, it is necessary to clarify the applicable constitutional provisions and standards. The Indictment under which Walsh was convicted charged him with violating 18 U.S.C. § 242 for conduct in violation of the Eighth and Fourteenth Amendments. Apparently, during some of the time (unspecified in the record or the briefs) alleged in Count I, Fowlks was in the jail as a pretrial detainee. While the Eighth Amendment's protection does not apply "until after conviction and sentence," *Graham v. Connor*, 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment, *see Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), establishes the minimum standards for whether abuse by a prison guard states a constitutional claim in contexts other than prison disturbances. *Hudson* held that a

claim of excessive force may be established even if the victim does not suffer "serious," *id.* at 7–9, 112 S.Ct. 995 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)), or "significant" injury, *Hudson,* · 503 U.S. at 9, 112 S.Ct. 995, provided that the amount of force used is more than "*de minimis,*" or involves force that is "repugnant to the conscience of mankind," *id.* at 9–10, 112 S.Ct. 995. However, *Hudson* was a case brought by a prisoner under the Eighth Amendment, *see id.* at 5, 112 S.Ct. 995, and we have not had the opportunity to decide whether the *Hudson* analysis applies to pretrial detainees under the Fourteenth Amendment. Because all excessive force claims in the prison context are qualified, and "not … every malevolent touch by a prison guard gives rise to a federal cause of action," *id.* at 9, 112 S.Ct. 995 (citing *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)), we conclude that the *Hudson* analysis is applicable to excessive force claims brought under the Fourteenth Amendment as well. *See, e.g., Riley v. Dorton,* 115 F.3d 1159, 1167 (4th Cir.) (applying *Hudson* analysis to excessive force claims brought by pretrial detainee under the Fourteenth Amendment), *cert. denied,* —— U.S. ——, 118 S.Ct. 631, 139 L.Ed.2d 611 (1997); *cf. Rivera v. New York,* No. 96 Civ. 7697, 1999 WL 13240, at \*5 (S.D.N.Y. Jan.12, 1999) (applying *Hudson* analysis to pretrial detainee's Fourteenth Amendment claim of denial of medical care).

### A. *Punishment*

Relying almost solely on our decision in *Johnson,* 481 F.2d 1028, Walsh argues that, even assuming he committed the acts with which he was charged, he did not commit an act prohibited by the Constitu-

tion because his acts did not constitute "punishment" actionable under the Eighth or Fourteenth Amendments.

In *Johnson* we addressed the issue of whether a single, spontaneous, unprovoked attack by a prison guard could form the basis for a pretrial detainee's claim under § 1983. *See id.* at 1032–33. Holding that such an attack could violate the Due Process Clause of the Fourteenth Amendment, we reversed the lower court's dismissal of the claim against the individual prison guard. *Id.* at 1033. In the decision, we pointed out that the Eighth Amendment was not applicable to pretrial detainees and emphasized that earlier cases applying the Eighth Amendment in the prison context had in common that the punishment at issue had been "deliberately administered for a penal or disciplinary purpose." *Id.* at 1032. We went on to state that "although a spontaneous attack by a guard is 'cruel' and, we hope, 'unusual,' it does not fit any ordinary concept of 'punishment.'" *Id.* Based on these statements, Walsh now proposes that if the act he committed was not for a penal purpose, *i.e.,* it was a spontaneous and unauthorized attack, it cannot constitute punishment sufficient to state a constitutional claim.

To the extent that *Johnson* defines "punishment" as narrowly as Walsh advocates,[7] we are inclined to agree with the government that, although *Hudson* leaves the issue explicitly unresolved, *see* 503 U.S. at 11–12, 112 S.Ct. 995, it implicitly expands the concept of "punishment." *Hudson* holds that, regardless of the context, "whenever prison officials stand accused of using excessive physical force in violation of the [Constitution], the core judicial inquiry is … whether force was

---

7. The language in *Johnson* relied upon by Walsh, arguably, is *dicta.* The observation regarding a "penal or disciplinary purpose," *see* 481 F.2d at 1032, served to distinguish the case at bar "where the plaintiff had not yet been found liable to 'punishment' of any sort," *id.,* from the cases we cited with approval brought under the Eighth Amendment.

We in fact held that what we termed allegations of "a single spontaneous incident, unforeseen and unforeseeable by higher authority" by a prison guard, could form the basis of a claim under the Fourteenth, but not the Eighth Amendment, in the pretrial context. *See id.* at 1034.

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6–7, 112 S.Ct. 995; *see also Bell,* 441 U.S. at 539, 99 S.Ct. 1861 (holding that punishment violating the due process rights of a pretrial detainee is that which is "arbitrary and purposeless").

Moreover, since *Johnson* and *Hudson,* we have upheld Eighth Amendment claims based on acts that would not meet the strict definition of punishment advanced by Walsh. In *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir.1997), for example, we held that sexual abuse of a prisoner by a corrections officer may constitute cruel and unusual punishment. *See id.* at 860–61. We stated that the Eighth Amendment prohibits behavior that, *inter alia,* "has no legitimate penological purpose," and is "simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 861 (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).[8] Indeed, it is the sadistic and unwarranted nature of the behavior, beyond what society expects its criminals to endure as punishment for their misdeeds, that renders the punishment "cruel and unusual."

In any event, drawing all favorable factual inferences for the government as we must, *see United States v. Walker,* 142 F.3d 103, 112 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 219, 142 L.Ed.2d 181 (1998), this case does not require us to resolve the issue explicitly left open by the Court in *Hudson.* As in *Hudson,* Walsh's acts were not isolated, spontaneous, or even unsanctioned by higher prison officials. *See United States v. Walsh,* 27 F.Supp.2d 186, 192 (W.D.N.Y.1998). Rather, the defendant, who was a senior corrections officer with the rank of lieutenant, was observed assaulting Fowlks three times. There was evidence at trial that the assaults on Fowlks were done with the knowledge of, and condoned by, Captain Charles Dingman, the jail warden. Moreover, the repetitive, non-spontaneous nature of the defendant's abuse is reflected in his statement to Fowlks during the incident charged in Count I. Kujawa heard Walsh say, "all right, Norvin, you know what you got to do, on your knees," and Bourke heard Walsh tell Fowlks, "you know what you have to do." Finally, Fowlks was in a holding cell, away from the general prison population as punishment for disruptive behavior and other misconduct when the three assaults occurred. Under even a narrow definition, therefore, Walsh's acts constitute "punishment." *See Hudson,* 503 U.S. at 11–12, 112 S.Ct. 995.

**B. *Degree of Harm***

 Walsh also argues that his acts do not rise to the level of a constitutional violation because they involved nothing more than the *de minimis* use of force, insufficient under *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 995. The government contends that the evidence shows that the amount of force used was more than *de minimis* and, in any event, Walsh's conduct falls under the exception enunciated in *Hudson,* prohibiting even *de minimis* force if it is " 'repugnant to the conscience of mankind.' " *Id.* We agree that the amount of force used was more than *de minimis* and, as the District Court concluded, that it was "repugnant to the conscience of mankind." *See Walsh,* 27 F.Supp.2d at 192.

*Hudson* highlights two conditions, one subjective and the other objective, that must be met in order to establish a constitutional claim in the prison context. First,

---

8. While we found the isolated incidents of unwanted touching in *Boddie* insufficiently serious to state a cause of action, the fact that the harassment was purely unwarranted and served no penological purpose weighed in favor of the cause of action, not against it.

*See* 105 F.3d at 861. Similarly, Boddie's separate excessive force claim based on the same conduct was rejected because the force alleged was not sufficiently serious or harmful, not because the acts were not "punishment" in the traditional sense. *Id.* at 862.

the subjective requirement is satisfied if the defendant has a "sufficiently culpable state of mind," 503 U.S. at 8, 112 S.Ct. 995 (internal quotation marks omitted), "shown by actions characterized by 'wantonness,'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999). Walsh does not, nor could he, challenge that the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force. *Cf. Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir.1994).

Second, it must be shown that the deprivation alleged is objectively sufficiently serious or harmful enough. *See Hudson*, 503 U.S. at 8, 112 S.Ct. 995. *Hudson* firmly establishes that this factor is satisfied in the excessive force context even if the victim does not suffer "serious," *id.* at 7–9, 112 S.Ct. 995 (quoting *Estelle*, 429 U.S. at 106, 97 S.Ct. 285), or "significant" injury, *Hudson*, 503 U.S. at 9, 112 S.Ct. 995, as long as the amount of force used is not *de minimis*, *id.* at 9–10, 112 S.Ct. 995. Read in the light most favorable to the government, we conclude that the force used here was more than *de minimis*. While we agree with other circuits that some degree of injury is ordinarily required to state a claim after *Hudson*, *see, e.g., Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir.1994) (agreeing with the Eighth and Fifth Circuits), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993) ("Although[ ] Jackson need not show a significant injury, he must have suffered at least some injury.") (per curiam); *Cummings v. Malone*, 995 F.2d 817, 822–23 (8th Cir.1993) (noting that its prior requirement of "actual injury" was "consistent with the Supreme Court's conclusion that more than *de minimis* force is necessary"); *but see Hudson*, 503 U.S. at 18, 112 S.Ct. 995 ("The extent to which a prisoner is *injured* by the force—indeed, whether he is injured at all—is in the Court's view irrelevant.") (Thomas, J., dissenting), we find that the pain suffered by Fowlks as a result of Walsh's assaults

satisfies this requirement, *see Norman*, 25 F.3d at 1264 n. 4.

In addition, even if the conduct at issue were deemed *de minimis*, it would fall within *Hudson's* explicit exception that even *de minimis* uses of force are unconstitutional if they are "repugnant to the conscience of mankind." 503 U.S. at 10, 112 S.Ct. 995 (internal quotation marks omitted). As we have recently stated, "the malicious use of force to cause harm[ ] constitute[s an] Eighth Amendment violation[ ] *per se*." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9, 112 S.Ct. 995). This is so because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Id.* (alteration in original) (internal quotation marks omitted).

Here, a 300 to 400 pound prison guard repeatedly and sadistically tortured a mentally disturbed prisoner for no legitimate penological purpose. Such conduct is unequivocally contrary to "contemporary standards of decency" and "repugnant to the conscience of mankind." *Whitley*, 475 U.S. at 327, 106 S.Ct. 1078 (quoting *Estelle*, 429 U.S. at 103, 106, 97 S.Ct. 285). Thus, even assuming that Walsh's acts did not constitute more than *de minimis* uses of force, they violated the Eighth Amendment.

### C. *Under Color of Law*

Walsh's final contention regarding the establishment of a constitutional violation is that he was not acting under color of law. This argument is also without merit.

The Supreme Court has broadly interpreted the color of law requirement, concluding that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

■ Walsh first argues that because any prisoner or visitor to the jail could have assaulted Fowlks in the manner alleged, he did not act by virtue of the authority of his office. We reject Walsh's argument. The fact that the defendant was a corrections officer, in charge of supervising, caring for, and disciplining the victim, provided Walsh with the access and opportunity to exercise his power over Fowlks. To say that Fowlks would have submitted to any other individual, who did not have the same degree of power over him as the defendant, is a factual assumption we decline to make. *Cf. Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir.1994) ("Prison authorities are clearly 'person[s] acting under color of state law'...."; "[T]he question of whether a state actor is involved tends to be an easy one in a prison context...."").

Second, Walsh argues that "under color of law" refers to a person's official actions, not his official status, and the acts alleged in this case were not part of the defendant's "official duties" but for his own "personal entertainment and gratification." Walsh is correct that "personal pursuits" of officers do not meet the color of law requirement. *See generally Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir.1994). The relevant question, however, is not whether the actual abuse was part of the defendant's official duties but, rather, whether the abuse was "made possible only because the wrongdoer is clothed with the authority of state law." *Classic*, 313 U.S. at 326, 61 S.Ct. 1031; *see also Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion) ("Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.").

Clearly, Walsh, on duty and in full uniform, was acting within his authority to supervise and care for inmates under his watch when the assaults occurred. Further, it is clear that Walsh was able to commit the assaults only by virtue of his position as a correctional officer and, finally, there was evidence in the record that Walsh's acts were in fact condoned by the jail warden. Taking the totality of the circumstances, *cf. Pitchell*, 13 F.3d at 548, and drawing all inferences in favor of the government, Walsh's conduct meets the "under color of law" requirement.

### III. *Sufficiency of the Evidence*

Walsh contends that no reasonable jury could have found him guilty beyond a reasonable doubt on any of the three counts of the Indictment. In particular, he argues that (1) the government's witnesses gave vague, contradictory, and incomprehensible testimony about the timing of the incidents; (2) the medical proof indicated that the events could not have occurred without Fowlks suffering serious physical injury, which he indisputably did not; and (3) the log books showed that Fowlks was not in the holding cell area when the incidents allegedly took place there.

■ A defendant seeking to overturn a conviction based upon insufficiency of the evidence bears a "heavy burden." *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir.), *cert. denied*, 516 U.S. 1001, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995). We view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor, *see United States v. Walker*, 142 F.3d at 112, deferring "to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998). "[W]e may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

■ Under the applicable standard, the sufficiency of the evidence in this case does not require extended discussion. Three current and former corrections officers, as well the victim himself and one

inmate, testified on the government's behalf. While there were some inconsistencies in their testimony, and the defendant's testimony contradicted that of the government's witnesses, the jury was free to resolve those discrepancies in favor of the government. Moreover, the government provided explanations at trial for the alleged inconsistencies in the log books. Sidari and Kujawa testified that Fowlks was in the holding area at least half the time he was in jail and that the logs, which were unreliable, did not reflect this.

With respect to the medical evidence, the government contended, and apparently the jury believed, that the defendant exerted enough physical pressure to cause Fowlks pain, but not lasting physical injury. While the defendant presented evidence on redirect that even a small amount of pressure by the defendant would likely have caused some visible injury, the jury was free to discredit that testimony.

Accordingly, it cannot be said, in light of the evidence presented, that no reasonable juror could have found the defendant guilty beyond a reasonable doubt on any of the counts in the Indictment.

### IV. *The District Court's Jury Charge*

■ A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir.1998) (internal quotation marks omitted). We will reverse only if the instructions, taken as a whole, caused the defendant prejudice. *See id.* Walsh contends that the jury instructions given by the court were erroneous in three respects. While we agree that the District Court erred in one regard, we find no grounds for reversal.

■ Walsh asserts that "the court essentially told the jury that it could convict

[him] under § 242 if it found merely that [he] was a correction[s] officer and that he was working in that capacity." This is not what the District Court instructed. Rather, the District Judge charged the jury that it could find that Walsh had acted under color of law "if the care, supervision and discipline of inmates," performed by the defendant at the time he assaulted Fowlks, was "an official duty of the defendant." Further, the District Court instructed the jury that if the abusive act was "an act performed beyond the defendant's authority as a corrections officer, you may find that [the] defendant acted under ... color of law...." Both statements are accurate summations of the plurality opinion in *Screws*, under which the defendant must be acting within his official duties, but the act of abuse need not be authorized by the system within which he works to be acting "under color of law." 325 U.S. at 111, 65 S.Ct. 1031.[9]

■ Walsh also argues that the willfulness charge was erroneous because the District Court stated at one point: "Now, that doesn't mean to say that the defendant knew there was a 14th amendment to the Constitution, but simply that he did the act as charged in the indictment." The District Court's charge on willfulness is accurate and based on the definition of willfulness in the Supreme Court's plurality opinion in *Screws*, 325 U.S. at 103–04, 65 S.Ct. 1031. The jury was properly instructed that Fowlks had a right under the Fourteenth Amendment to be free from having a corrections officer inflict physical pain upon him unnecessarily or wantonly, and, while it did not have to find that the defendant acted with knowledge of the particular provision of the Constitution at issue, it had to find that the defendant "intended to invade [an] interest protected by the Constitution." *See id.* at

---

9. Walsh's claim that the District Court erred in telling the jury that it could find the color of law requirement satisfied if the defendant was acting as a corrections officer "during the time frame set forth in the indictment," rather than "at the very time that the alleged incidents occurred," is frivolous. It was clear from the charge that the jury had to find that Walsh was acting under color of law at the time the assaults occurred.

103, 106, 65 S.Ct. 1031 (asserting that willfulness within the meaning of a precursor to § 242 requires proof of a "specific intent to deprive a person of a federal right" but this does not require proof that the defendant was "thinking in constitutional terms").

Next, Walsh takes issue with the District Court's treatment of the constitutional rights involved. As explained above, the charges against Walsh encompassed a time during which Fowlks was incarcerated as a pretrial detainee, protected by the Fourteenth Amendment, and when he was incarcerated post-conviction as an inmate, protected by the Eighth Amendment. Walsh first complains that the District Court did not mention the words "Eighth Amendment" in its charge. This absence is irrelevant because the charge defined the right protected by the Eighth Amendment—namely the right to be free from "cruel and unusual punishment." *See United States v. Munoz*, 143 F.3d 632, 636 (2d Cir.1998) ("The critical issue is whether the concept the district court conveyed to the jury, regardless of what it was called, accurately defined grounds upon which the jury could convict [the defendant] . . . .")

■ Second, Walsh argues that the District Court should have instructed the jury on the "shocks the conscience" standard applicable to due process claims under the Fourteenth Amendment, *see Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), and mentioned the term "due process." Instead, the District Judge instructed the jury exclusively on the "unnecessary and wanton infliction of pain" standard associated with Eighth Amendment claims. *See Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). While the failure to articulate the correct standard for claims brought by pretrial detainees was technically error, *cf. Lareau v. Manson*, 651 F.2d 96, 102 (2d Cir.1981) (claims regarding conditions of confinement brought by pretrial detainees must be evaluated separately from those brought by sentenced inmates because the constitutional standard differs), Walsh cannot demonstrate any prejudice resulting from the error.

■ The factors used to evaluate the "shocks the conscience" and the "unnecessary and wanton" standards in the context of excessive force claims in the prison context are identical—specifically, the need for the application of force, the relationship between the need and amount of force that was used, the extent of the injury inflicted, and whether the force was applied in a good-faith effort to restore discipline or sadistically for the purpose of causing harm. *See Hudson*, 503 U.S. at 7, 112 S.Ct. 995; *Johnson*, 481 F.2d at 1033. Therefore, while the terms used to articulate the standard are different, in substance they are the same with respect to excessive force claims in the prison context, and the jury could not have been misled or confused by the failure to articulate the proper terminology.

■ Finally, Walsh argues that the District Court should have given instructions "to guide [the jury's] determination of whether any acts proved at trial violated Mr. Fowlks's Eighth or Fourteenth Amendment rights." In other words, Walsh now argues that the District Court should have listed the factors enunciated in *Hudson* and *Johnson* to evaluate whether the force used amounted to a constitutional violation. As the government points out, this objection was not voiced at trial, and Walsh did not request an instruction of this sort. Accordingly, this alleged error is reviewed only for "plain error," *United States v. Ballistrea*, 101 F.3d 827, 834 (2d Cir.1996), *cert. denied*, 520 U.S. 1150, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997), which is a "very stringent" standard requiring a "serious injustice" or a conviction in "a manner inconsistent with fairness and integrity of judicial proceedings," *United*

**54**

*States v. Ramirez,* 973 F.2d 102, 105 (2d Cir.1992) (internal quotation marks omitted). This standard is not met here.

■ First, the failure to list the *Hudson* factors in evaluating "wanton and unnecessary infliction of pain" does not render the charge incorrect, only possibly incomplete. The phrase, however, is not so esoteric or complex that the jury could not evaluate it without reference to the *Hudson* factors. Second, as the government points out, even if such a charge was required, Walsh suffered no prejudice or injustice from its absence. His defense at trial was not that the amount of force used did not amount to a constitutional violation, but that the acts alleged did not occur. The medical evidence was offered only to show the implausibility of the testimony offered by the government's witnesses.

Viewing the charge as a whole, *see United States v. Carr,* 880 F.2d 1550, 1555 (2d Cir.1989), we find no reversible error.

## CONCLUSION

To summarize, we hold that: (1) the Indictment was sufficient; (2) the District Court did not exceed its allowable discretion in denying the motion for a bill of particulars; (3) the evidence at trial was sufficient to establish a constitutional violation and guilt beyond a reasonable doubt; and (4) the instruction to the jury contained no reversible error. Accordingly, the judgment of the District Court is affirmed.