**Orlando ORTIZ, Plaintiff,**

v.

**Lieutenant C.A. PEARSON, Corrections Officer C. Abplanalp, and the United States of America, Defendants.**

No. 97 Civ. 885(KMW)(THK).

United States District Court,
S.D. New York.

Feb. 22, 2000.

ORDER

KIMBA M. WOOD, District Judge.

*Pro se* plaintiff alleges that federal prison officials used excessive force against him during pre-trial detention, entitling him to monetary relief from the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, and from individual defendants pursuant to the implied constitutional right of action recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and its progeny. Defendants move for summary judgment dismissing both claims or, in the alternative, to sever and stay the *Bivens* action pending trial on the FTCA claim. In a Report and Recommendation (the "Report") dated November 5, 1999, Magistrate Judge Katz recommended that defendants' motion be denied in its entirety because (1) a genuine factual dispute exists as to whether prison officials engaged in conduct constituting excessive force, (2) a genuine factual dispute exists as to whether individual defendants are entitled to qualified immunity, (3) the FTCA waives sovereign immunity as to the alleged conduct, and (4) separate trials of the *Bivens* and FTCA claims are inappropriate under the circumstances. For the reasons stated below, the Court rejects defendants' objections to Magistrate Judge Katz's thorough and persuasive Report, familiarity with which is assumed, and adopts the Report in its entirety.

## I. *Discussion*

The Court reviews *de novo* the Report on this potentially dispositive motion. *See* 28 U.S.C. § 636(b)(1).

### A. *The Factual Basis of Plaintiff's Bivens Claim*

The Court adopts the Report's careful analysis of the competing accounts of the underlying facts and its conclusion that the reasonable inferences most favorable to plaintiff would support a jury finding that (1) the force used went beyond the *de minimis* level not subject to constitutional

John J. Sullivan, Henry A. Lanman, New York City, for Plaintiff.

Aaron M. Katz, Assistant United States Attorney, New York City, for Defendants.

scrutiny, and (2) the force was applied with a "sufficiently culpable state of mind . . . characterized by 'wantonness'" to violate the Constitution. *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir.1999) (setting out standards for excessive force claims by pre-trial detainees) (internal quotation marks and citations omitted). Defendants' objections on these points merely reiterate their view of the facts rather than the reasonable view most favorable to plaintiff.

■ Individual defendants' objections that they are entitled to qualified immunity as a matter of law are similarly flawed. In this case, the critical issues for qualified immunity purposes are the same underlying factual disputes as those for the excessive force claim itself: (1) did plaintiff resist defendant Abplanalp's attempt to handcuff him, or did Abplanalp physically prevent plaintiff from complying with his orders? (2) did defendants lift plaintiff's body to a forty-five degree angle from the ground by pulling on his wrists handcuffed behind his back and then drop him face-first into the concrete, or did they lift him by his armpits without dropping him? When the availability of qualified immunity turns on the disputed underlying material facts, not on the reasonableness of actions taken in undisputed factual circumstances, "jury consideration is normally required." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994); *cf. Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995) (noting that the judge is required "to resolve questions of reasonableness on summary judgment in qualified immunity cases where the material facts are not in dispute"). Were the jury to accept plaintiff's version of the facts, this would be a case in which "no officer of reasonable competence could have made the same choice in similar circumstances," *Lennon*, 66 F.3d at 420–21, and not one in which individual defendants could have reasonably, but mistakenly, thought their actions lawful. *See Oliveira*, 23 F.3d at 648–49 (distinguishing between the reasonableness of actions for constitutional liability purposes and the reasonableness of belief in the actions' lawfulness for qualified immunity purposes).

**B. *The Scope of the FTCA's Waiver of Sovereign Immunity***

■ The Court adopts the Report's thoroughly reasoned conclusion that the FTCA's waiver of sovereign immunity for law enforcement officers' intentional torts is not limited to torts committed in the course of a search, seizure, or arrest. First, the plain language of the provision at issue distinguishes between the *acts* for which immunity is waived—"assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution"—and the class of *persons* for whose acts immunity is waived—officers "empowered by law to execute searches, to seize evidence, or to make arrests." 28 U.S.C. § 2680(h); *accord Crow v. United States*, 659 F.Supp. 556, 570 (D.Kan.1987); *Harris v. United States*, 677 F.Supp. 403, 405 (W.D.N.C.1988). Second, the legislative history makes clear that Congress did not intend to limit the waiver to torts arising from activities subject to Fourth Amendment scrutiny, notwithstanding the fact that the legislation was motivated by particular instances of such activity. *See* S.Rep. No. 93–588 at 3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 2789, 2791 (noting that the provision "would submit the Government to liability whenever its agents . . . injure the public through [illegal] search and seizures" but that the "amendment should not be viewed as limited to constitutional tort situations"); *Harris*, 677 F.Supp. at 404–05; *cf. Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

The authorities cited by defendants do not compel another result. Defendants rely on the Third Circuit's decision in *Pooler v. United States*, 787 F.2d 868 (3d Cir.1986), which held that § 2680(h) addresses only "conduct in the course of a search, a seizure, or an arrest." *Id.* at 872.

For the reasons stated above and discussed fully in the Report, the Court concludes that *Pooler* was wrongly decided and instead follows the broader interpretation given § 2680(h) by all other federal courts to consider the issue, including the D.C. Circuit. *See Sami v. United States,* 617 F.2d 755, 764–65 (D.C.Cir.1979); *Employers Ins. of Wausau v. United States,* 815 F.Supp. 255 (N.D.Ill.1993); *Harris,* 677 F.Supp. 403; *Crow,* 659 F.Supp. 556.

The unpublished opinion in *Wood v. United States,* No. 92 Civ. 247(JSM), 1993 WL 177821 (S.D.N.Y. May 17, 1993), is not to the contrary. In *Wood,* Judge Martin ruled that the United States could not be sued under the FTCA for damages arising from a Drug Enforcement Administration ("DEA") investigator's killing of his wife in their home, while off duty, with a privately owned gun, and in the absence of any DEA requirement that he carry a firearm while off duty. Among other reasons, Judge Martin found that there had been no waiver of sovereign immunity and noted the *Pooler* decision; the opinion, however, does not adopt *Pooler* but rather notes the "even greater reason" not to apply the law enforcement officer waiver when the tort was committed "by an off-duty agent in his home in the middle of the night." *Id.* at *1. *Wood* is therefore entirely consistent with those authorities applying § 2680(h) to torts committed in the course of law enforcement activity without limitation to those committed in the course of search, seizure, or arrest. *See generally Employers Ins. of Wausau,* 815 F.Supp. 255, 259–60. It is undisputed here that the torts alleged here were committed in the course of individual defendants' employment as law enforcement officers.[1]

### C. Severance of the Bivens and FTCA Claims

■ The Court adopts the Report's recommendation against severing and staying the *Bivens* claim pending a bench trial on the FTCA claim. Defendants object to the alleged burdens of trying the claims against all defendants because 28 U.S.C. § 2676 bars recovery against individual defendants once judgment has been entered on the FTCA claim. Defendants, however, fail to articulate the nature of these burdens: because the claims arise from the same set of facts and all defendants are being represented by the same counsel, a trial on one claim is not necessarily less burdensome than two separate trials with duplicative evidence and argument. Severance and trial on the FTCA claim would, however, seriously burden plaintiff's right to a jury trial because the Court would resolve the contested factual issues in the FTCA bench trial. *See* Fed.R.Civ.P. 42(b) (severance must "preserv[e] inviolate the right of trial by jury"). In the absence of any authority suggesting that § 2676 requires severance of *Bivens* and FTCA claims alleged together in a single action, the Court concludes that in this case separate trials would neither further convenience nor avoid prejudice; therefore, it declines to sever the two claims for trial. *See* Fed.R.Civ.P. 42(b).

### II. Conclusion

For the reasons stated above, the Court denies defendants' motion for summary judgment in its entirety. A Joint Pre-trial Order is due March 6, 2000.

SO ORDERED.

### REPORT AND RECOMMENDATION

KATZ, United States Magistrate Judge.

In January 1997, plaintiff Orlando Ortiz instituted this action, *pro se,* alleging that federal prison officials used excessive force against him. Following the appearance of

---

1. *Kohn v. United States,* 680 F.2d 922 (2d Cir.1982), also cited by defendants, does not address the issue at hand. *Kohn* merely holds that § 2680(h) does not waive sovereign immunity for the "purely intra-military torts" to which sovereign immunity applies under *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), regardless of whether they occur in the course of a search, seizure, or arrest. 680 F.2d at 926.

counsel on his behalf, Ortiz filed two amended complaints. In his Second Amended Complaint ("Compl."), Ortiz alleges that defendants Carl A. Pearson and Carl Abplanalp violated his Fifth Amendment right to due process and his Eighth Amendment right to be free from cruel and inhuman punishment. (Compl.¶¶ 2, 27, 30). Among other relief, he seeks to recover money damages from the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2672–2680 ("FTCA"), and from the individual defendants pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The defendants have moved for summary judgment on the grounds that the undisputed facts demonstrate that they did not use constitutionally excessive force and, in any event, that the individual defendants are entitled to qualified immunity. Additionally, the defendants contend that plaintiff's FTCA claim against the United States is barred by sovereign immunity. Finally, in the event that these assertions are rejected, the defendants maintain that Ortiz's *Bivens* claim should be severed and stayed pending the outcome of a bench trial on his FTCA claim. *See* Defendants' Memorandum in Support of Motion for Summary Judgment ("Defs.Mem."), at 2–3. For the reasons set forth below, I recommend that the defendants' motion for summary judgment be denied. I further recommend that plaintiff's *Bivens* and FTCA claims not be severed.

## FACTUAL BACKGROUND

### I. *The Incident*

#### A. *Ortiz's Version of Events*

On Sunday, September 15, 1996, at about 1:00 p.m., while he was a pretrial detainee at the Otisville Federal Correc-

tional Institution ("Otisville"), Ortiz was subjected to a random pat search by defendant Abplanalp during a "move." *See* Deposition of Orlando Ortiz ("Ortiz Dep.") at 160, 171, attached as Ex. A to Declaration of Aaron M. Katz, Esq. ("Katz Decl.").[1] Following the search, Abplanalp concluded that Ortiz had violated prison rules by carrying a "Walkman" radio allegedly borrowed from his cellmate, and he confiscated the radio. (Ortiz Dep. at 173–78.)

A disagreement ensued. Ortiz evidently believed that Abplanalp should have resolved any concern about the radio by taking Ortiz to his cellmate to confirm its ownership. (Ortiz Dep. at 177–78.) Abplanalp, on the other hand, thought that Ortiz's comments to him were "belligerent" and "disrespect[ful]," that his authority had been compromised, and that he had to "save face." (Deposition of Carl Abplanalp ("Abplanalp Dep.") at 11, 17, 24, attached as Ex. C to Katz Decl.) He therefore escorted Ortiz to the Lieutenant's Office. (*Id.* at 11.)

According to Ortiz, when they arrived at the Lieutenant's Office, defendant Pearson, and Andrew Long (both lieutenants) were present. (Ortiz Dep. at 186.) After Abplanalp recounted the preceding events, Pearson asked to hear from Ortiz. Ortiz contends that Abplanalp then stepped out of the office and returned to the compound. (*Id.* at 195.) Ortiz thereafter allegedly told Pearson that Abplanalp was familiar with both Ortiz and his cellmate, that Abplanalp had been harassing Ortiz, and that the incident should have been handled less formally. (*Id.* at 194–96.) Ortiz concedes that, during this conversation, Pearson, Long, and he began speaking "on top of each other," and that he was "a little upset."[2] (Ortiz Dep. at 196–97, 204; *see also* Deposition of Carl Pearson) ("Pearson Dep.") at 208, attached as Ex. E

---

1. A "move" is a ten-minute period, usually occurring once each hour, during which prisoners may move across the prison compound without a pass. *See* Deposition of Arthur Roberts ("Roberts Dep.") at 110–11, attached

as Ex. A to Declaration of John J. Sullivan, Esq. ("Sullivan Decl.").

2. At this point Arthur Roberts, a counselor, entered the Lieutenant's Office. (Ortiz Dep. at 196.)

to Katz Decl.; Deposition of Andrew Long ("Long Dep.") at 114–15, attached as Ex. D to Katz Decl.

Ortiz claims that Pearson instructed him to "[g]o get the owner of the radio." (Ortiz Dep. at 200.) Ortiz testified that he requested a pass, but was advised by Pearson to inform any officer who stopped him that Pearson had authorized him to cross the compound without a pass. (*Id.* at 200–04.) Ortiz further testified that he then left the office and crossed the compound, encountering Abplanalp, who stopped him and asked, "what the hell [are] you doing." (*Id.* at 276.) Ortiz contends that he told Abplanalp that Pearson had instructed him to cross the compound without a pass to retrieve his cellmate. (Ortiz Dep. at 229–30, 276–77.) According to Ortiz, Abplanalp responded by abruptly slapping a handcuff around his left wrist, causing him pain. (*Id.* at 229–31.) Abplanalp then allegedly told a "stunned" Ortiz to a "turn around." (*Id.*) Ortiz alleges that he attempted to comply with this order (which was repeated), but that Abplanalp began "moving the opposite way with [his] handcuff." (*Id.* at 227, 297.) Ortiz contends that Abplanalp moved in this direction either because he was confused or because he affirmatively sought to make compliance impossible. (*Id.* at 228–238.) Ortiz further contends that he did nothing which could be construed as resistance; rather, he stopped speaking, did not verbally object to being handcuffed, and did not move away from Abplanalp or struggle. (*Id.*)

Thereafter, Pearson, Long, and several other officers emerged from the Lieutenant's Office. (*Id.* at 232, 236.) According to Ortiz, when Abplanalp became aware that his superiors were approaching, he "stretched [Ortiz's] arm … and slammed [Ortiz] into the concrete," causing injuries to Ortiz's knee, shoulder, and face. (*Id.* at 236, 239, 240–41.) Once Ortiz was on the ground, Abplanalp placed the other handcuff on Ortiz's right wrist. (*Id.* at 244.)

Ortiz alleges that, while he was lying on the concrete floor, Pearson straddled him, grabbed him by the handcuffs, and lifted him from the concrete, pulling his arms behind his back and raising his upper body to a forty-five degree angle from the floor. (*Id.* at 244–46, 48.) Ortiz allegedly heard another officer say something to the effect of "Don't pick him up that way, Pearson," after which Ortiz was released and fell face first to the floor. (*Id.* at 245–46, 248, 284.) Ortiz alleges that he became very disoriented, and was subsequently dragged to the Lieutenant's Office. (*Id.; see also* Pearson Dep. at 255–57.)

Although initial x-ray examinations after the assault confirmed that he had not broken any bones, Ortiz contends that Bureau of Prison medical records also show that he suffered a black eye, as well as bruising and abrasions to his face, leg, and shoulder. (Compl. at ¶ 1). Ortiz further asserts that, despite his repeated (and well-documented) complaints of pain in his left shoulder over the course of two years, prison medical personnel did not order an MRI examination. An MRI examination conducted during the course of this litigation allegedly shows that Ortiz suffered a partial tear of his left rotator cuff as a result of the incident. *See* Plaintiff's Memorandum of Law in Opposition to Summary Judgment Motion ("Ortiz Mem."), at 8–9; *see also* RI Report, attached as Ex. P to Sullivan Decl. Ortiz contends that this injury has resulted in chronic pain. *See* Ortiz Mem., at 8–10.

B. *The Defendants' Version*

Abplanalp, Pearson, and their fellow officers proffered a substantially different account of the incident. For example, Abplanalp testified that he remained in the Lieutenant's Office while Pearson and Ortiz spoke. At the end of the conversation, according to Abplanalp, Pearson advised Ortiz to leave "before I put you in the hole." [3] (Abplanalp Dep. at 12.) As Ortiz

---

**3.** Pearson's use of the phrase "the hole" apparently refers to the Special Housing Unit at Otisville, also known as the "SHU."

was leaving, he allegedly muttered "fuck him," at which point Long ordered Abplanalp to place Ortiz in handcuffs and take him to the Special Housing Unit. (*Id.* at 13.)

Abplanalp testified that he approached Ortiz outside the office and ordered him to stop, but that Ortiz initially did not comply. (*Id.*)[4] When Ortiz finally stopped, Abplanalp informed him that Officer Long wanted to see him. Ortiz then asked, "For what?" (*Id.* at 13.) At this point, Ortiz allegedly began walking toward Abplanalp, waving his arms in the air, and "getting louder and more aggressive in his behavior." (*Id.* at 14.) Abplanalp testified that Ortiz's actions made him feel "nervous and quite fearful." (Abplanalp Dep. at 14.) When Ortiz moved within ten feet, Abplanalp ordered Ortiz to "turn around and cuff up," but Ortiz allegedly continued to move toward Abplanalp and did not turn around. (*Id.*) Abplanalp then attempted, unsuccessfully, to execute a "Sankyo hold" or restraint upon Ortiz, during which he turned his body in the same direction that Ortiz was moving. (*Id.* at 15–16, 49–50.) Shortly thereafter, according to Abplanalp, Ortiz tripped, pulling Abplanalp on top of him as he fell to the ground. (*Id.* at 63–65.) According to Abplanalp, "someone" placed handcuffs on Ortiz, and he and Pearson then lifted Ortiz from the floor by wrapping their arms under his arm pits. Since Ortiz refused to stand up, he was carried to the Lieutenant's Office with his feet dragging behind him. (*Id.* at 71.)

Pearson testified that he discussed the confiscation of the radio with Ortiz after being briefed by Abplanalp. (Pearson Dep. at 187.) During the later conversation, Ortiz allegedly said, "this is fucked up; this is bull shit," which "upset" Pearson. (*Id.* at 209.) In an attempt to defuse the situation, Pearson allegedly told Ortiz to locate his cellmate, "bring him [ ] here, and have him prove to me it's his radio," which Ortiz refused to do. (*Id.* at 187, 211.) Pearson testified that Ortiz cursed

at him as he was leaving the office. (*Id.* at 218.) Accordingly, Pearson instructed Abplanalp to "go get him and bring him in the office." (*Id.* at 220.)

Pearson testified that, once Abplanalp left the office, he became concerned that there might be "a problem with this guy," so he went outside of the office where he saw Abplanalp holding Ortiz by the wrist while trying to get him "to cuff up." (*Id.* at 188.) Pearson testified that he then ordered Ortiz to "cuff up," but that Ortiz resisted, stating repeatedly that he was "not cuffing up." (*Id.* at 188, 242–43.) According to Pearson, he and Abplanalp then "wrestled [Ortiz] to the ground and cuffed him up." (*Id.* at 188.) Pearson explained that, in the course of this struggle, he "grabbed [Ortiz] by the shoulder and pushed him down on the ground." (Pearson Dep. at 245.) Pearson further testified that he, Abplanalp, and Ortiz all fell to the ground together. (*Id.* at 246.) After Ortiz was placed in handcuffs, Pearson and Abplanalp lifted Ortiz by grabbing him by his arm pits. (*Id.* at 252.) Pearson did not recall any other attempt to lift Ortiz from the floor, nor did he remember anyone saying not to pick up Ortiz "that way." (*Id.* at 254.) According to Pearson, a group of about twenty to thirty inmates had stopped near the incident, which necessitated that Ortiz be removed from the area. (*Id.* at 253–54, 257.)

Lieutenant Long testified that when Ortiz entered the Lieutenant's Office, he was "belligerent" and "disruptive." (Long Dep. at 122.) After he heard Ortiz say something to the effect of, "Fuck you," or "Fuck off, Lieutenant" as he was leaving the office, Long instructed Abplanalp to "[g]o lock him up." (*Id.* at 117.) Long then heard a commotion outside the Lieutenant's Office. By the time Long left the office, Ortiz was face down on the floor with his hands cuffed behind his back. (*Id.* at 115, 129.) Long testified that he then saw two other officers lift Ortiz from

---

4. Abplanalp testified further that he did not ask Ortiz for a pass because passes generally

are not required at Otisville on weekends. (Abplanalp Dep. at 55.)

the floor "[l]ike you're supposed to" by placing their arms under both of his arms "like a fork lift." (*Id.*) Long said that he did not hear anyone caution against lifting Ortiz in any particular way, nor did he witness any other attempt to lift Ortiz from the floor. (*Id.*)

Roberts also was deposed. He testified that when he left the office, Abplanalp had a hand or handcuff on Ortiz's wrist and was telling him to turn around so he could be cuffed before being taken to "the hole." *See* Deposition of Arthur Roberts ("Roberts Dep.") at 94–95, attached as Ex. F to Katz Decl. According to Roberts, Ortiz did not verbally refuse to comply with Abplanalp's orders, but nevertheless failed to turn as instructed. (*Id.* at 95.) Roberts said that Pearson then put Ortiz into a "bear hug, and [took] him to the ground." (*Id.* at 97–98.) Once this was accomplished, Pearson and Abplanalp placed Ortiz in handcuffs and carried him off with his feet "under him, but ... kind of ... dragging behind." (*Id.* at 105.) According to Roberts, after the officers and Ortiz reentered the Lieutenant's Office, Ortiz did not appear to be injured and declined medical treatment. He was examined by a physician's assistant and then taken to the Special Housing Unit.[5] (*Id.* at 108.)

### C. *The Inmate Witnesses*

Two inmates also observed the incident. Inmate David Soler testified that he heard a commotion while he was in the barber shop near the Lieutenant's Office. When he looked outside, he saw Ortiz "on his stomach." (Deposition of David Soler ("Soler Dep.") at 23–27, attached as Ex. B to Sullivan Decl.) Soler said that he saw "officers ... holding [Ortiz, and] from his waist up to his head he wasn't touching the ground, and they just dropped him." (*Id.* at 24, 35.) He further testified that Ortiz was not "showing any signs of aggression, and appeared unconscious. Ortiz then was dragged from the scene." (*Id.* at 33–35,

42.) Inmate Antonio Garcia testified that, after the incident, Ortiz was dragged with his hands handcuffed behind his back, rather than being picked up, and that he appeared to be unconscious. (Deposition of Antonio Garcia ("Garcia Dep.") at 39, attached as Ex. G to Sullivan Decl.)

### DISCUSSION

The individual defendants argue that they are entitled to summary judgment on the *Bivens* claim because their use of force was necessary to maintain prison discipline once Ortiz refused to submit to handcuffing. *See* Defs.Mem., at 18–28. They further allege that their use of force was (a) de minimis, as evidenced by the fact that a medical examination of Ortiz shortly after the incident revealed "no broken bones," and (b) justifiable, in light of the "tense and quickly developing situation." *See Id.* The individual defendants further contend that they are entitled to qualified immunity. *See Id.* at 28–31.

The defendants also maintain that the FTCA claim against the United States is barred, as a matter of law, because the actions in issue are not covered by the Government's waiver of immunity provision in the Federal Torts Claims Act. *See* Defs.Mem., at 31–34. In the alternative, defendants argue that the Court should exercise its discretion to sever and stay plaintiff's *Bivens* claim pending a final disposition of the FTCA claim. *See Id.* at 34–36.

### I. *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

**5.** Roberts also testified that passes generally were not required on Sundays for inmates to

cross the compound. (*Id.* at 113.)

is entitled to a judgment as a matter of law.

In deciding such a motion, the Court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). The Court must accept as true the non-moving party's contentions, if supported by affidavits or other competent evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). On such motions, assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *See Id.; see also* Fed.R.Civ.P. 56(e), 1963 Advisory Committee Note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl*, 128 F.3d at 55; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*II. Excessive Force Claim*

 Ortiz was a pre-trial detainee, rather than a convicted inmate at the time of the incident. Accordingly, his excessive force claim arises under the Due Process Clause of the Fifth Amendment rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447 (1979); *Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir.1991); *see also Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 372 n. 1, 112 S.Ct. 748, 754, 116 L.Ed.2d 867 (1992). Since punishment of a detainee who has not been found guilty is prohibited by the Due Process Clause, the relevant question is not whether the detainee has been subjected to cruel and unusual punishment, but whether he has been punished at all. *See Bell*, 441 U.S. at 535–37, 99 S.Ct. at 1872–73. Until recently, the Second Circuit had not decided whether the standards enunciated in Eighth Amendment cases involving excessive use of force against sentenced prisoners, applied to pretrial detainees as well. The Second Circuit has now answered that question in the affirmative. *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999).

 To make out a constitutional claim of excessive force, a pretrial detainee must prove both an objective component (that the use of force was objectively serious), and a subjective component (that the officials acted with a sufficiently culpable state of mind). *See Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); *Walsh*, at 49–50. In weighing these issues, a court should consider the following factors:

> [T]he need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.

*Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986); *accord Hudson*, 503 U.S. at 7, 112 S.Ct. at 999; *Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir.1994); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973). Although the extent of the injury suffered by a detainee is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim. *See Hudson*, 503 U.S. at 7–9, 112 S.Ct. at 997–99; *Walsh*, 194 F.3d 37, 50; *Griffin v. Crippen*, 193 F.3d 89, 91–92 (2d Cir.1999).

There is conflicting evidence in the record as to whether the defendants acted with a malicious and sadistic intent, or whether they were simply applying force in a good faith effort to maintain discipline, and this conflict is most appropriately resolved by a jury. For example, defendant Abplanalp concedes that his use of force was preceded by an argument about the confiscation of plaintiff's radio, which led him to believe that his authority had been

compromised and that he needed to "save face." Furthermore, although plaintiff claims that Abplanalp was the first to depart from the Lieutenant's Office, if he remained there, as the defendants contend, he would have heard Ortiz's conceded use of one or more expletives as he was leaving the office. A juror crediting Ortiz's testimony that Abplanalp challenged him only a few moments later to produce a pass (which apparently was not required on a Sunday), could reasonably infer that Abplanalp was, in fact, harassing Ortiz. Similarly, there is conflicting evidence of the circumstances surrounding Abplanalp's handcuffing of the plaintiff—whether plaintiff resisted in any way or was intentionally thwarted by Abplanalp, and whether plaintiff was intentionally thrown to the ground and by whom, or whether he merely tripped. Perhaps, the most compelling evidence that the defendants may not have acted in a good faith effort to maintain discipline, but, rather, with the intent to cause harm, is the testimony of Ortiz and Soler that Ortiz's upper body was picked up and he was then dropped face first while he was handcuffed and unable to break his fall.[6] Finally, Abplanalp's claim that he was fearful of Ortiz, who was waving his arms and speaking in Spanish, may itself eventually prove to be incredible since Ortiz claims—and for present purposes the Court must assume—that he does not speak Spanish well. (Ortiz Dep. at 322.) *See Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988) (Second Circuit reverses grant of summary judgment, concluding that contrary to defendants' version of the incident, where plaintiff was alleged to have refused to obey an order, used a racial slur, and caused a potentially inflammatory situation in view of the presence of other inmates, a jury could find that the defendant started an argument with the plaintiff and then struck the plaintiff without justification, and that even if the plaintiff had refused to obey an order, the defendant used gratuitous and excessive force).

Turning to the objective component of Ortiz's Fifth Amendment claim, there is no basis for the Court to find, as a matter of law, that the use of force was de minimis and therefore not actionable. To support this contention, the defendants note that x-rays taken on the date of the incident show no broken bones. *See* Defs.Mem., at 16–17. They further observe that a soft tissue injury of the type that Ortiz sustained cannot be considered excessive because there is no evidence that the use of force was unnecessary, disproportionate, or malicious. *Id.,* at 25. However, as noted above, Ortiz has adduced evidence which, if credited, shows that the defendants lifted him improperly while his hands were cuffed behind his back, and then permitted his head to crash to the concrete floor, resulting in a black eye, bruises to his shoulder and leg, and his losing consciousness. Finally, there is medical evidence that he has a partially torn rotator cuff, which may or may not be attributable to this incident. Under these circumstances, the Court is unable to conclude that Ortiz's injuries are de minimis as a matter of law. *See Hudson,* 503 U.S. at 10, 112 S.Ct. at 1000 ("[B]lows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, were not de minimis."); *Davidson v. Flynn,* 32 F.3d 27, 29–30 (2d Cir.1994) (intentionally placing handcuffs on inmate too tightly so as to cause pain and permanent injury, even if some restraint on inmate was appropriate, is sufficient to meet *Hudson* standards so as to justify denying motion to dismiss); *Mitchell v. Keane,* 974 F.Supp. 332, 340 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the inmate's

---

**6.** Moreover, although the defendants claim that their use of force was necessary to maintain prison discipline in view of the "quickly developing" and "tense" situation, because twenty to thirty inmates were in the area, a jury could conclude that no credible showing has been made that there was, in fact, a threat posed by the inmates in the area. Rather, as plaintiff observes, the only commotion that existed may have been attributable to the officers' actions.

shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of *Hudson* test so as to preclude dismissal); *Lloyde v. Lord,* No. 94 Civ. 484(KMW), 1997 WL 123996, at *3 (S.D.N.Y. Mar.19, 1997) (allegation that defendant grabbed inmate from behind by her clothing, bringing her to the ground, twisting her arm behind her back, placing foot on her back for twenty minutes, and dragging her along the ground, resulting in minimal swelling of shoulder and knee, is not de minimis as a matter of law, and therefore summary judgment should not be granted).[7]

In sum, the defendants have not shown, as they must, that Ortiz has failed to make out a prima facie excessive force claim. Plaintiff has adduced evidence which establishes that there are material issues of fact which can only be resolved at trial. *See Moore v. Ortiz,* No. 98 Civ. 2626(AGS), 1998 WL 226195, at *2–3 (S.D.N.Y. May 4, 1998) (where officers claimed they used de minimis force to subdue inmate by taking him to the floor, handcuffing him, and lifting him to his feet, and that inmate suffered only minor injuries because he refused medical treatment on the day of the incident, while inmate claimed officers threw him face first to the floor, drove knee into his back and smacked his face to the ground, causing, *inter alia,* bloody lip, two loose teeth and a black eye, court denied summary judgment because there were material disputes as to the objective and subjective elements of the *Hudson* test).

### III. Qualified Immunity

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982)). Furthermore, even when a plaintiff's constitutional rights and the scope of the "permissible conduct are clearly established, the qualified immunity defense protects a government official if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon,* 66 F.3d at 420 (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). A defendant may meet this objective reasonableness test by showing that "officers of reasonable competence could disagree as to the legality of the defendant's actions." *Lennon,* 66 F.3d at 420 (quoting *Malley v. Briggs,* 475 U.S. 335, 340–41, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986)). This standard provides a significant margin of error which protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (citations omitted). Nevertheless, it is well settled in this Circuit that a defendant's ability to rely on qualified immunity from liability is a question of law for the court to decide on summary judgment *only* when "the factual record is not in serious dispute." *Lennon,*

---

7. In isolation, the contention that defendant Abplanalp pushed plaintiff to the ground, over his outstretched leg, purportedly in order to handcuff him, presents a closer question as to whether, as a matter of law, it could be held to have been either a de minimis use of force or a good faith effort to restrain plaintiff. Nevertheless, the Court is of the view that the entire incident and all uses of force against plaintiff should be evaluated by the jury *in toto,* rather than parsing the somewhat confusing evidence as to the need to shove plaintiff to the ground prior to cuffing him, and the lifting and dropping of plaintiff to the ground after he was cuffed. The circumstances surrounding plaintiff's initial fall to the ground are in dispute—there is conflicting evidence on whether he tripped or was shoved by Abplanalp alone or by Alblanalp and Pearson together. Similarly, it is unclear which, if any of plaintiff's injuries, were sustained as the result of his being shoved to the ground as opposed to his later being lifted and dropped face first.

66 F.3d at 421 (2d Cir.1995) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (1990)).

■ In this case, plaintiff's constitutional right not to be subjected to unnecessary force was clearly established prior to the incident. *See Brown v. Doe*, 2 F.3d 1236, 1242 (2d Cir.1993) (citing *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) ("[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment")); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977) (the "unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.")). Accordingly, the individual defendants are entitled to qualified immunity only if they are able to establish, as a matter of law, that it was "objectively reasonable" for them to believe that their conduct was lawful.

If the Court credits plaintiff's version of the facts, as it must for purposes of the instant motion, this is an impossible task because the defendants would have to show that "officers of reasonable competence could disagree" as to the propriety of shoving plaintiff to the ground when he was neither resisting nor disobeying defendants' orders, of handcuffing Ortiz, of raising his upper body several feet, and of then dropping him face first on the concrete while he was unable to slow his fall. Moreover, as this Court has previously observed, the determination that plaintiff has "alleged sufficient facts to support a viable claim of excessive force" necessarily means that the Court "cannot conclude as a matter of law that [such] conduct was objectively reasonable." *Lloyde v. Lord*, 1997 WL 123996, at *3. Accordingly, I respectfully recommend that defendants' motion for summary judgment on the basis of qualified immunity be denied.

## IV. Federal Torts Claims Act

### A. Waiver of Sovereign Immunity

■ The United States is entitled to sovereign immunity, except where such immunity has been waived unequivocally. *See United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 112 S.Ct. 1627, 1633, 118 L.Ed.2d 255 (1992). Congress has chosen to waive immunity as to certain claims against the United States by creating the Federal Torts Claims Act ("FTCA"). That waiver, however, is not absolute. *See Wilson v. United States*, 959 F.2d 12, 14 (2d Cir.1992). The FTCA does not generally waive the sovereign immunity of the United States with respect to intentional torts, including "[a]ny claim arising out of assault [or] battery." *See* 28 U.S.C. § 2680(h); *Sheridan v. United States*, 487 U.S. 392, 398, 108 S.Ct. 2449, 2454, 101 L.Ed.2d 352 (1988); *United States v. Shearer*, 473 U.S. 52, 54, 105 S.Ct. 3039, 3041, 87 L.Ed.2d 38 (1985). There is an exception, however, for "acts or omissions of investigative or law enforcement officers of the United States Government" arising out of any claim "of assault [or] battery." 28 U.S.C. § 2680(h); *see also Wilson v. United States*, 959 F.2d at 14. The term investigative or law enforcement officer is defined for this purpose as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).[8]

---

8. The relevant text of the provision of the FTCA providing for the intentional tort exception to the waiver of immunity, provides that immunity is not waived with respect to,

Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process.... *Provided,* That with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising .. out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.
28 U.S.C. § 2680(h).

Defendants concede that the individual defendants in this action qualify as "law enforcement officers" as defined in Section 2680(h). *See* Defs. Mem., at 32, n. 8. They nevertheless maintain that plaintiff's FTCA claim is barred because the individual defendants are not alleged to have committed an assault while in the course of executing a search, seizing evidence, or making an arrest. In support of their argument, defendants rely upon the Third Circuit's decision in *Pooler v. United States*, 787 F.2d 868, 872 (3d Cir.1986), and the legislative history of Section 2680(h).

In *Pooler*, the Third Circuit reasoned that the intentional tort waiver of immunity provision of the FTCA was limited only to law enforcement officials' actions committed in the course of a search, seizure or arrest. *See Pooler*, 787 F.2d at 872 (citing S.Rep. No. 588, 93d Cong, 2d Sess., 2–3 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 2789, 2790–91). Since the alleged assault in this case occurred while the defendants were attempting to transport Ortiz from the compound to the SHU, but arguably not during a search, seizure, or arrest, defendants contend that there has been no waiver of sovereign immunity.

The few courts that have directly addressed the holding of *Pooler* have not adopted its narrow reading of Section 2680(h). *See Harris v. United States*, 677 F.Supp. 403, 405–06 (W.D.N.C.1988); *Crow v. United States*, 659 F.Supp. 556, 570 (D.Kan.1987); *Employers Insurance of Wausau v. United States*, 815 F.Supp. 255, (N.D.Ill.1993) (rejecting restrictive view of *Pooler*, court concludes that for immunity to be waived, intentional tort being challenged must be committed by a law enforcement officer merely when he is engaged in a law enforcement activity); *cf.*

*Barber v. Grow*, 929 F.Supp. 820, 824 (E.D.Pa.1996) (court assumes that as long as person who intentionally pulled chair out from underneath a prisoner was a law enforcement officer, even though this conduct did not occur in the course of an arrest, search or seizure, plaintiff would have a claim under the FTCA for assault and battery); *but see Wood v. United States*, No. 92 Civ. 0247(JSM), 1993 WL 177821, at *1 (S.D.N.Y. May 17, 1993) (court adopts *Pooler* view of § 2680(h)).

As in the cases cited above, this Court finds itself in disagreement with *Pooler*, since, without any principled underpinning, the Third Circuit's view would render Section 2680(h) inapplicable to many legitimate complaints that corrections officers used excessive force against inmates in circumstances which do not involve a search, seizure or arrest. It also distorts the plain language of the statute, which, on its face, does not require that the law enforcement officer be engaged in one of the enumerated acts at the time of the alleged wrongdoing. The statute is unambiguous in waiving the Government's immunity with respect to any claim arising out of an assault committed by a federal law enforcement officer. It only references searches, seizures and arrests in attempting to define who may be considered a federal law enforcement officer. It would have been easy enough for Congress to have provided that it was waiving immunity with regard to acts of law enforcement officers only *while* such officers are executing searches, seizures or arrests. Congress failed to do so, choosing instead to waive immunity for certain intentional torts, including assaults, committed by law enforcement officers who have the authority to make searches, seizures and arrests.[9]

9. That defendants' proposed interpretation of Section 2680(h) is erroneous, is also supported by dictum in the Supreme Court's decision in *Carlson v. Green*, 446 U.S. 14, 20, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980). In *Carlson*, the Supreme Court observed in an action alleging that federal prison officials had violated an inmate's Eighth Amendment rights by failing to provide him with adequate medical care, that " § 2680(h) thus contemplates that victims of the kind of intentional wrongdoing alleged in this complaint shall have an action under the FTCA against the United States as well as a Bivens action against the individual officials alleged to have infringed their constitutional rights." 446 U.S. at 20, 100 S.Ct. at 1472. The Court expressed no concern that the officials' actions did not occur in the course of a search, seizure or arrest.

Moreover, as another court has observed, under the *Pooler* interpretation, the provision of the statute waiving immunity as to claims of malicious prosecution would be rendered meaningless, because it is difficult to conceive of how a federal official could commit the acts constituting malicious prosecution in the course of an arrest, search or seizure. *See Crow,* 659 F.Supp. at 570.[10]

Furthermore, because the language of § 2680(h) is unambiguous, the sparse legislative history that the Third Circuit relied upon in reaching a contrary position is irrelevant. It is black letter law that a court should not resort to legislative history unless a statute is ambiguous. *See Lee v. Bankers Trust Co.,* 166 F.3d 540, 544 (2d Cir.1999); *Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998).

Finally, in its decision in *Hernandez v. Lattimore,* 612 F.2d 61, 64 (2d Cir.1979), the Second Circuit held that, in addition to his FTCA claim, the plaintiff had a *Bivens* claim arising out of his beating by federal correctional officials. Although there was no appeal in *Hernandez* of the district court's finding that an FTCA claim had been properly pled, the Second Circuit accepted that the conduct in issue gave rise to a waiver of immunity under the FTCA, even though it did not arise in the course of an arrest, search or seizure. Consistent with the language of § 2680(h), the Court only concerned itself with the power to make arrests in the context of defining who, under the statute, could be considered a law enforcement officer. *See Hernandez,* 612 F.2d at 64, n. 7. Defendants argue that *Hernandez* "does not foreclose [their] proposed interpretation of § 2680(h)," because the Second Circuit was not expressly asked to consider the availability of the FTCA remedy. *See* Defs. Reply Mem., at 12. Suffice it to say,

if this aspect of the *Hernandez* decision is dicta, it is persuasive dicta.

For all of the above reasons, the Court concludes that the FTCA waiver of sovereign immunity is applicable to plaintiff's claims.

**B.** *Severance and Election of Remedies*

The defendants' final contention is that if the Court permits plaintiff's FTCA claim to proceed, it should exercise its discretion under Federal Rule of Civil Procedure 42(b) to sever Ortiz's FTCA and *Bivens* claims, and stay the *Bivens* claim. Defendants' primary argument in favor of severance is that a single trial on all of Ortiz's claims would be inefficient. The FTCA claim will be tried to the Court and the *Bivens* claim entails the right to a jury trial. Defendants contend that since a judgment on the FTCA claim would bar a recovery on the *Bivens* claim, trying the FTCA claim first would avoid the time and expense associated with a jury trial, including determining the proportional liability of each defendant as well as the right to punitive damages, which does exist under the FTCA. Plaintiff opposes the application to sever his claims, but requests that in the event that a severance is granted, he be permitted to elect as to which claim to proceed on first.

As the Second Circuit made clear in its *Hernandez* decision, a plaintiff may *commence* an action containing both *Bivens* and FTCA claims because the "two remedies do not stand in pari materia." *Hernandez,* 612 F.2d at 67. *See also Carlson v. Green,* 446 U.S. 14, 19–20, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980) ("[W]hen Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, 28 U.S.C.

---

**10.** Plaintiff argues, in the alternative, that the defendants' alleged wrongdoing occurred in the course of a search or arrest because it followed Abplanalp's random pat search and resulted in his removal to the SHU. *See* Ortiz

Mem., at 25 n. 9. There is no need to consider this somewhat strained interpretation of the facts unless the Court adopts the reasoning of *Pooler.*

2680(h), the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and Bivens as parallel, complementary causes of action."). The mere fact that a plaintiff may *bring* both claims in a single action, however, does not mean that ultimately he can *recover* on both. Indeed, the FTCA expressly bars a plaintiff from recovering damages against an employee of the government after securing final judgment on an FTCA claim arising out of the same facts. *See* 28 U.S.C. § 2676; *see also Gasho v. United States*, 39 F.3d 1420, 1437 (9th Cir.1994). Accordingly, when both claims are brought in a single action, the FTCA bar will prevent a successful plaintiff from recovering *Bivens* damages from the individual defendants, even if both claims are tried together and judgments on both are entered simultaneously. *See Serra v. Pichardo*, 786 F.2d 237, 241 (6th Cir.1986); *see also Engle v. Mecke*, 24 F.3d 133, 135 (10th Cir.1994); *Ting v. United States*, 927 F.2d 1504, 1513 n. 9 (9th Cir.1991); *Birnbaum v. United States*, 588 F.2d 319, 333 (2d Cir.1978) ("Since a judgment in an action against the United States under the FTCA will constitute a judgment in bar in favor of the employee whose acts have given rise to the claim, 28 U.S.C. § 2676, it is likely, however, that claims for torts would be made against the United States rather than, as Bivens suits, against the employee."); *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1201 (4th Cir.1978); *Popal v. United States*, No. 94 Civ. 6178(DLC), 1996 WL 185731, at *2–3 (S.D.N.Y. Apr.18, 1996).

Although, ultimately, plaintiff may have the right to recover on either his FTCA or *Bivens* claim, but not on both, there is no compelling reason to force plaintiff to make that choice now or to sever the claims. Nor is there any sound basis for the Court to require that the FTCA claim be tried first.

Although the Court has the discretion to sever the claims under Rule 42(b), Fed. R.Civ.P., there is little efficiency to be gained from severance in this action. The proof with regard to each of the claims will be virtually identical.[11] *Cf. Gasho*, 39 F.3d at 1438 ("Plaintiffs contemplating both a Bivens claim and an FTCA claim will be encouraged to pursue their claims concurrently in the same action, instead of in separate actions. This will foster more efficient settlement of claims, since the evidence and proof in FTCA and Bivens claims often overlap.") Thus, assuming plaintiff was required to elect a remedy, and chose to proceed first on his *Bivens* claim and later on the FTCA claim, the parties and the Court might be required to participate in two virtually identical trials. That would indeed be wasteful. Alternatively, if plaintiff was required to proceed first on the FTCA claim, it would in effect preclude any remedy on the *Bivens* claim since the FTCA judgment would bar any recovery against the individual officers. This would defeat Congress's intent in providing two complementary remedies, and would serve to deprive plaintiff of his right to a jury trial, raising Seventh Amendment concerns. *See* Fed.R.Civ.P. 42(b) ("The court, in furtherance of convenience, or to avoid prejudice, or when separate trials will be conclusive to expedition and economy, may order a separate trial of any claim ... *always preserving inviolate the right to a trial by jury as declared by the Seventh Amendment to the Constitution ....*") (emphasis added); *Engle*, 24 F.3d at 135 ("Had [the plaintiff] chosen to seek his redress from the individual law enforcement officer, the jury verdict [on the Bivens claim] would have been given full effect and his Seventh Amendment rights would have been preserved.")

11. Although defendants contend that the *Bivens* trial involves the possibility of punitive damages and allocation of liability among each of the two defendants, this is unlikely to involve substantial additional evidence or time. If the Court so chooses, it may defer hearing evidence on punitive damages until there is a verdict on the underlying *Bivens* claim—thus allowing for the possibility that such evidence, if any, need never be heard.

If the claims are not severed, a bifurcated trial could be held in which the FTCA claim would be heard by the Court and the *Bivens* claim would be tried to a jury. If the jury was permitted to first deliver its verdict on the *Bivens* claim, and plaintiff was successful, plaintiff might then choose to dismiss the FTCA claim, thereby eliminating the need for a decision by the Court.[12] Alternatively, if the jury returned a verdict against plaintiff on his *Bivens* claim, he would still have the right to pursue his FTCA claim, and the Court could issue a decision based on the evidence it had already heard when the case was being tried to the jury. It is not uncommon for a court to hear the same evidence presented to a jury, where different remedies are available from each trier of fact. *See, e.g., Engle,* 24 F.3d at 134 (district court bifurcated trial, first submitting *Bivens* claims to the jury and then ruling on the FTCA claim); *Serra,* 786 F.2d at 239 (single trial on FTCA and *Bivens* claims was conducted, after which Government stipulated to liability on the FTCA claims, thereby nullifying *Bivens* judgment); *Gallardo v. United States,* 697 F.Supp. 1243 (E.D.N.Y.1988) (same evidence was heard by jury on negligence claims among the parties, and by the court on the FTCA claim, although jury's findings did not control on court's determination of FTCA claim).

Judges of this Court have not taken a consistent approach to this issue. In one recent case, Judge Rakoff decided to sever the FTCA and *Bivens* claims, but allowed the plaintiff to elect on which remedy he chose to proceed. *See Adami v. United States,* 94 Civ. 8773(JSR) (S.D.N.Y. Feb. 17, 1998) (transcript of hearing at 17–27, 42–46), attached as Ex. J to Katz Decl. In *Adami,* the Court did not appear to base its decision on principles of law; rather, Judge Rakoff was of the view that if he tried both claims together in a bifurcated trial, he would want to immediately issue his decision from the bench on the FTCA claim, thus rendering the jury's verdict on the *Bivens* claim superfluous. In addition, the plaintiff had an FTCA claim for malicious prosecution, but did not have a similar *Bivens* claim. Thus, there was some reluctance to allow the jury to hear evidence that was not relevant to the claims it was considering. After Judge Rakoff ordered that the claims be severed in *Adami,* the plaintiff elected to proceed on the *Bivens* claim.

In *Rivera v. United States,* No. 88 Civ. 2395(SHS) (S.D.N.Y.), Judge Stein directed that the FTCA claim be tried first, in large part because there were eighteen individual defendants, and a jury trial with respect to each defendant's liability was perceived as being significantly more complex than an FTCA trial in which only the Government's liability was in issue. *See* Order dated May 17, 1996, attached to Defs. Mem. As a practical matter, the court's approach in *Rivera* extinguished the plaintiff's *Bivens* claim and right to a jury trial. *Cf. Carlson,* 446 U.S. at 23, 100 S.Ct. at 1474 ("Plainly FTCA is not a sufficient protection of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.").

Finally, in *Popal v. United States,* 99 Civ. 6178(DLC), Judge Cote dismissed the plaintiffs' *Bivens* claims because the Government accepted judgment on plaintiffs' FTCA claims. Consistent with the case law cited above, Judge Cote found that a judgment on the FTCA claims precluded any further action against the individual employees on the *Bivens* claims. *See Popal,* 1996 WL 185731, at *2–3.

Unlike these cases, which were much more complex and involved multiple parties, in this action, the number of witnesses is limited and the evidence to be presented

---

**12.** A decision to then proceed on the FTCA claim might jeopardize any favorable verdict plaintiff received on his *Bivens* claim since, as the cases cited above indicate, a decision and judgment on the FTCA claim is likely to nullify any *Bivens* judgment. *See, e.g., Engle,* 24 F.3d at 134–36; *Serra,* 786 F.2d at 241–42.

on the *Bivens* and FTCA claims substantially overlaps. Moreover, thus far there has been no admission of liability by the Government with respect to the FTCA claim. Thus, a single, but bifurcated trial on the FTCA and *Bivens* claims would not be unduly burdensome and would preserve plaintiff's right to pursue claims under both *Bivens* and the FTCA.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that the defendants' summary judgment motion be denied. I further recommend that the *Bivens* and FTCA claims not be severed, and that the jury be allowed to first render its verdict on the *Bivens* claim.

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten days from today, serve and file them with the Clerk of the Court and send courtesy copies to the chambers of the Honorable Kimba M. Wood and the undersigned. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993) *cert denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Secretary of Health and Human Svs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.