**UNITED STATES of America,**
**Appellee,**

v.

**Rosalie GARCIA, Manuel Roman,**
**Ricardo Silva, Defendants–**
**Appellants.**

Nos. 06–2879–cr(L), 06–3779–cr(con),
06–4116–cr(con).

United States Court of Appeals,
Second Circuit.

May 29, 2008.

Theodore S. Green, Green & Willstatter, White Plains, New York, for Defendant–Appellant Rosalie Garcia.

Richard Palma, New York, New York, for Defendant–Appellant Manuel Roman.

Jane Simkin Smith, Millbrook, New York, for Defendant–Appellant Ricardo Silva.

David M. Rody, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, Todd W. Blanche, Celeste L. Koelveld, Assistant United States Attorneys, on the brief), New York, New York, for Appellee.

PRESENT: Hon. SONIA SOTOMAYOR, Hon. RICHARD C. WESLEY, Hon. J. CLIFFORD WALLACE,* Circuit Judges.

## SUMMARY ORDER

Rosalie Garcia, Manuel Roman, and Ricardo Silva appeal from judgments of conviction entered on June 14, 2006, July 24, 2006, and August 18, 2006, respectively, in the United States District Court for the Southern District of New York (Lynch, *J.*), following a six-week jury trial on a twelve-count superseding indictment charging them with racketeering, narcotics trafficking, murder and other offenses related to their participation in an alleged heroin-distribution organization centered on Hoe Avenue in the Bronx, New York (the "Hoe Avenue Crew"). We presume the parties' familiarity with the underlying facts and procedural history of this case.

## I. Rosalie Garcia

Garcia challenges: (a) the district court's determination that she was competent to stand trial; (b) the sufficiency of the evidence with respect to the 1994 and 1997 RICO murder-related predicate acts and their related substantive counts; (c) the district court's failure to instruct the jury on the elements of criminal facilitation under New York law; and (d) the introduction of allegedly impermissible hearsay.

### a. Competency

Garcia asserts that the district court erred in finding her competent to stand trial because "a cluster of symptoms—depressive disorder, substance abuse, borderline intellectual functioning, and anxiety" rendered her unable to assist in her defense. To be competent to stand trial, a defendant "must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Nichols,* 56 F.3d 403, 410 (2d Cir.1995) (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). A court determines competency by a preponderance of the evidence, although Garcia correctly observes that the burden of proof in establishing competency is undecided in this Circuit and by the Supreme Court. *Id.*

■ The district court's finding that Garcia was competent to stand trial was not clearly erroneous. Both experts who examined Garcia found that she "ha[d] a factual and rational understanding of the proceedings." Moreover, although the defense expert expressed a "hedged" opinion that Garcia was not competent to stand trial, he was concerned primarily with Garcia's "ability to assist at . . . more sophisticated levels." In making its competency determination, the district court explained that although the legal issues of the case might be complex, "[t]he factual matters about which the defendant needs ultimately to advise counsel are . . . simpler." In addition, based on its own observation of Garcia in proceedings up to that point, the recorded telephone conversations, and on

---

* The Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

the analysis of both experts, the district court held that Garcia "has the ability to consult with her lawyer with a reasonable degree of rational understanding." We find no clear error in the district court's competency determination.

### b. Sufficiency of the Evidence Claims

■ Garcia also argues that there was insufficient evidence to support her conviction of racketeering acts three and four of Count One, Count Six, and Count Seven because (1) the February 1994 murders were committed by other individuals in connection with a separate drug conspiracy; and (2) her mere presence in the room when Roman allegedly issued a contract for killing members of a rival drug organization, which allegedly led to the 1994 double murder, is insufficient to support conviction. After a review of the record, drawing all inferences in favor of the government, see United States v. Stanley, 928 F.2d 575, 576 (2d Cir.1991), we conclude that the government presented sufficient evidence to enable a rational jury to find Garcia guilty beyond a reasonable doubt.

For example, the government introduced evidence that the 1994 double murder came at the close of a three month "war" between the Hoe Avenue Crew and a rival drug organization, and that the murders were in retaliation for the murder by a rival drug crew of Roman's best friend, with whom Garcia was also close. The government also presented evidence that Garcia and Roman paid a Santeria priestess for a spell that would reveal the identity of Otero's murderer, so that he could be killed. Although Serrano's testimony at trial indicated that Garcia was merely present when Roman offered a contract for anyone who killed a member of the rival drug organization, Serrano also testified that Garcia was consulted regarding payment for the 1994 double murders. This evidence, along with other testimony about Garcia's leadership in the Hoe Avenue Crew, provides a sufficient basis for a reasonable juror to convict Garcia of the murder-related counts for the 1994 murders.

■ With respect to the 1997 murder of Richard "Orco" Rodriguez, there was ample evidence from which a reasonable juror could find Garcia guilty. Testimony at trial indicated that on the night of the murder, Garcia was "hysterical" and "screaming" as she told Roman that Orco had taken drugs from one of her workers, dared her to tell Roman to come and get the drugs back himself, and threatened to kill her the next time he saw her on the block. Garcia reportedly screamed to Roman, about Orco: "I'm tired of is shit. We got to do something. We got to kill him." Garcia then went to retrieve a bag with two guns inside and handed it to Roman and Velez. In addition, another government cooperator testified that in the weeks leading up to Orco's murder, Garcia instructed workers to call her if Orco showed up on the block. The witness explained that when Garcia would receive those phone calls, she would call Roman and notify him that Orco was around; Roman would then say he was going "to take care of it," and go out with his gun. Although Garcia argues that the evidence did not demonstrate an agreement that Orco would actually be killed, a rational juror, having heard this testimony and other evidence introduced at trial, could have concluded otherwise. We find no basis for reversing Garcia's conviction on the 1997 murder-related charges.

### c. Criminal Facilitation Jury Instruction

Garcia next challenges the district court's failure to charge the jury on the

elements of criminal facilitation under New York Penal Law 115.05, which was an alternative to murder and attempted murder charged as racketeering acts 3(B), 4, 5, and 6(b) of Count One, and Count Four (murder in aid of racketeering). Because the jury convicted Garcia under the greater *mens rea* burden required to prove the predicate acts of murder and/or attempted murder, any error by the district court in this regard was harmless. *See United States v. Walsh,* 194 F.3d 37, 52 (2d Cir. 1999) ("We will reverse only if the instructions, taken as a whole, caused the defendant prejudice.").

#### d. Hearsay

Garcia asserts that the district court impermissibly admitted several hearsay statements against her: (1) Serrano's claim that he spoke to other workers at 914 Hoe Avenue, who he suggested worked for Garcia and Roman; (2) Serrano's statement that, after witnessing Ruben Rosario shoot at an empty car, Rosario told Serrano that he shot at the car because Garcia told him a rival drug leader was in it; (3) Serrano's two brief statements about his interactions with other drug dealers—"Leo" and "Gary"—who were in competition with Garcia; and (4) Serrano's testimony about an exchange he had with "Julio," who he believed worked for Garcia. Any error the district court might have committed in admitting these statements was harmless and does not provide a basis for reversal. *See United States v. Rivera,* 22 F.3d 430, 436 (2d Cir.1994).

### II. Manuel Roman

Roman challenges the sufficiency of the evidence to convict him on each of the five murder charges and, based on his assertion that each of those convictions should be reversed, he challenges the sufficiency of the evidence to convict him of the RICO substantive offense and RICO conspiracy. In addition, Roman argues that the district court erred in failing to instruct the jury on the elements of criminal facilitation under New York law and in admitting the gun recovered from a search of his car in 1995.

#### a. Sufficiency of the Evidence Regarding the February 1994 Murders

Like Garcia, Roman argues that the evidence was insufficient to convict him of involvement in the 1994 double murder of Causcut and Quinones, because the murders were committed by members of a separate crack conspiracy. Although there was evidence that Serrano and the other two shooters involved in the 1994 double murder were part of a separate crack conspiracy, there was also ample testimony connecting Roman and the Hoe Avenue Crew to the murders.[1]

■ Serrano testified that Roman offered $10,000 to anyone who killed a member of the rival drug gang; that Roman gave Serrano and others guns for protection; that Roman and Garcia paid a priestess to cast a spell that would reveal the killer of Roman's best friend, so that mem-

---

1. Roman's attempt to argue that the record demonstrates Serrano "withdrew" from the Hoe Avenue conspiracy is inapposite. Withdrawal is an affirmative defense, and Serrano was not a defendant in this case. In addition, Serrano's alleged concurrent participation in a crack distribution conspiracy is not necessarily inconsistent with his continued partic-

ipation in the Hoe Avenue narcotics conspiracy. *Cf. United States v. Jones,* 482 F.3d 60, 72 (2d Cir.2006) (explaining that an individual might engage in "more than one conspiracy in violation of the same statutory provision" even if "the conspiracies existed for different—albeit overlapping—periods of time").

bers of the Hoe Avenue Crew could kill him in retaliation; and that Roman ultimately paid Serrano and the two other shooters $ 5,000 for killing Quinones and Causcut. Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, *see United States v. Glenn,* 312 F.3d 58, 63 (2d Cir.2002), a rational juror could conclude that the 1994 murders were committed in furtherance of the Hoe Avenue narcotics conspiracy at the direction of Roman and Garcia.

### b. Alleged Hearsay and Sufficiency of the Evidence Regarding the Murder of Victor Rivera

Roman asserts that the only evidence implicating him in the murder of Victor Rivera, aka Tramp, was inadmissible hearsay, and therefore there was insufficient evidence to convict him. The primary evidence with respect to Tramp's murder came from Serrano, who testified that Silva admitted to killing Tramp for Roman. The district court permitted Serrano's testimony because it was comprised of coconspirator statements made during the course and in furtherance of the Hoe Avenue narcotics conspiracy. *See* Rule 801(d)(2)(E).

■ This admission was not clearly erroneous. *See United States v. Padilla,* 203 F.3d 156, 161 (2d Cir.2000) (per curiam) (reviewing district court's admission of alleged hearsay evidence only for "clear error"). The district court was required to find "first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." *See id.* (internal quotation marks omitted). There was ample evidence demonstrating that Roman and Silva were engaged in a narcotics conspiracy and/or a conspiracy to murder members

of a rival drug gang, and that Silva's statements were made during the course of the conspiracy. In addition, although Silva's statement expressed dissatisfaction with how Roman paid him for Tramp's murder, the district court did not abuse its discretion in finding that the statement was made "in furtherance" of the ongoing narcotics conspiracy. Serrano and Silva were talking about the possibility of committing the murders for which Roman had contracted, against the rival drug gang and how they would carry out their assignment. *See United States v. Gigante,* 166 F.3d 75, 82 (2d Cir.1999) (explaining that statements that "serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" satisfy the in-furtherance requirement) (internal quotation marks omitted); *see also United States v. Thai,* 29 F.3d 785, 813 (2d Cir.1994) ("[S]tatements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy. . . .").

### c. Sufficiency of the Evidence Regarding the Murder of Roberto "Orco" Rodriguez

■ Roman argues that there was insufficient evidence to support his conviction for the murder of Roberto "Orco" Rodriguez and related charges principally because testimony at trial did not demonstrate Roman's agreement or intent to kill Orco. We disagree. Prior to the actual murder, a government informant recorded a conversation in which he and Roman spoke about arranging Orco's murder. Second, a cooperating witness testified that after Garcia told Roman that they "had to do something," and "had to kill him," Roman took a bag with guns from his mother and headed to Hoe Avenue to find Orco. Garcia reportedly told Roman "[t]o be careful and make sure that every-

thing is done right." When the group found Orco at the pool hall, Roman reportedly dragged him out of the bathroom and pistol-whipped him. At one point he told Velez not to shoot, but Morges—another cooperating witness—shot and killed him before they left the pool hall. Although Roman is correct that testimony indicates he told Velez not to shoot, and was mad after the incident, there was sufficient evidence from which a rational juror could conclude that Roman intended to kill Orco. Velez testified that Roman stated: "We wasn't supposed to kill him like that. We wasn't supposed to kill him in front of people." Morges testified that the plan had been to kill Orco after a kidnaping, and that Roman was mad because they had planned to "do whatever we was going to do to him somewhere else where nobody could see." The government provided ample evidence from which a rational trier of fact could conclude that Roman was guilty of the charges relating to Orco's murder.

■ Roman's contention that the government failed to prove that he aided and abetted and conspired to murder Orco "for the purpose of gaining entrance to or increasing [his] position" in the racketeering enterprise, as required to convict on Counts Three and Four under 18 U.S.C. § 1959(a), is also without merit. "[O]n its face, § 1959 encompasses violent crimes intended to preserve a defendant's position in an enterprise or to enhance his reputation and wealth within that enterprise." *United States v. Bruno,* 383 F.3d 65, 83 (2d Cir.2004) (internal quotation marks and alterations omitted). Viewing the evidence in the light most favorable to the government, a rational juror could conclude that Roman conspired to kill Orco because, "as one of the highest ranking [Hoe Avenue Crew] leaders," he was expected to protect the Crew's drug business and maintain his leadership position. *See United States v. Diaz,* 176 F.3d 52, 95–96 (2d Cir.1999).

### d. Criminal Facilitation Jury Instruction

Roman's argument concerning the criminal facilitation jury charge fails for the same reason that Garcia's fails: Roman suffered no prejudice. *See Walsh,* 194 F.3d at 52.

### e. The Substantive RICO and RICO Conspiracy Convictions

Roman premises his challenge to the substantive RICO and RICO conspiracy convictions on his success in obtaining reversal on any of the murder charges. Because we find no reversible error in Roman's conviction on those counts for the reasons stated *infra,* his challenges to the RICO convictions necessarily fail.

### f. Suppression of the Gun

Roman also asserts that the district court erred in admitting into evidence a gun that was seized after Roman allowed a police officer to search his car during a traffic stop.[2] Roman argues that the gun should have been suppressed because the officer retrieved it by using a tire iron to open a trap compartment in the dashboard, thereby exceeding the scope of Roman's consent. "[W]e review *de novo* the legal issues presented by a motion to suppress, [but] we accept the district court's factual findings unless clearly erroneous, and we view those facts in the light most favorable to the government." *United States v. Casado,* 303 F.3d 440, 443 (2d Cir.2002).

The district court found that Roman "consented to a search of the car." It

---

**2.** Roman does not contest the propriety of the    stop.

further found that Roman did not withhold consent from the officer to open the trap the officer suspected was behind the dashboard. Rather, the court held that Roman denied *knowledge* of the trap, not *consent* to open it, and his response in that exchange did not limit the scope of his consent. The district court further found the testimony of Officer Hopkins, who conducted the search, to be "exceptionally credible;" on that basis, the court credited his testimony that, although he used a tire iron to open the trap where the gun was found, he did so "gently" and "without damaging [the compartment]."

█ Viewing the facts in the light most favorable to the government, we cannot conclude that the district court's finding that Officer Hopkins "gently" pried open the trap compartment "without causing it any damage" was clearly erroneous. On the facts the district court found, it was objectively reasonable for the officer to believe that the scope of Roman's consent permitted him to conduct the search in the reasonable manner he did. *See United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995). Therefore, the district court did not err in denying Roman's suppression motion.

### III. Ricardo Silva

Silva presents six main challenges to his conviction: (a) that the government failed to prove his participation in the narcotics conspiracy within the limitations period; (b) that, as a result of the government's failure to prove his continuing involvement in the narcotics conspiracy, the admission of statements of alleged co-conspirators was erroneous; (c) that the narcotics conspiracy did not require a mandatory life sentence; (d) that jury instructions omitted an element of the 21 U.S.C. § 848(e) murder charges; (e) that his alleged admissions regarding the murder of "Tramp"

were not supported by substantial independent evidence; and (f) that the evidence was insufficient to demonstrate his participation in the operation or management of the affairs of the narcotics enterprise, as required for a RICO conviction.

#### a. The Five–Year Limitations Period

Silva argues that the government failed to prove his membership in the narcotics conspiracy beyond November 1996, or within five years of when the initial indictment was handed down against him, and therefore he should have been acquitted on the narcotics conspiracy count (Count 11), the substantive racketeering count (Count 1), the racketeering conspiracy count (Count Two), and the firearms count (Count 12). Silva's argument rests principally on testimony by one of the government's witnesses indicating that, in 1997, Roman and other members of the Hoe Avenue Crew considered Silva a "snitch" and had terminated their dealings with him.

Unless a statute expressly provides otherwise, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282. Where a conspiracy does not require proof of an overt act—such as a racketeering conspiracy under 18 U.S.C. § 1962(d) or a narcotics conspiracy under 21 U.S.C. § 846—the conspiracy "is presumed to exist until there has been an affirmative showing that it has been terminated, and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *United States v. Spero,* 331 F.3d 57, 60 (2d Cir. 2003) (internal quotation marks, alterations, and emphasis omitted).

Once the government met its burden of demonstrating that the narcotics conspiracy existed and extended into the limitations period, and that Silva was a member of the conspiracy, Silva was required to prove that he withdrew from the conspiracy prior to the limitations period in order to sustain that defense. *See id.* at 61. Withdrawal requires proof of "some act that affirmatively established that he disavowed his criminal association with the conspiracy, and that he communicated his withdrawal to the co-conspirators." *United States v. Minicone,* 960 F.2d 1099, 1108 (2d Cir.1992) (internal citation omitted). "[M]ere cessation of activity is not sufficient." *United States v. Flaharty,* 295 F.3d 182, 192 (2d Cir.2002). Although the testimony casting Silva as a "snitch" suggests that he might have had a falling out with Roman, it does not demonstrate that Silva affirmatively withdrew from or abandoned the conspiracy prior to the limitations period.[3] Nor does Silva's incarceration for a period of the limitations period necessarily terminate his participation in the conspiracy. *See id.* at 193 ("[W]hether a coconspirator's imprisonment constitutes a withdrawal 'must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence.'" (quoting *United States v. Panebianco,* 543 F.2d 447, 454 n. 5 (2d Cir.1976))). In addition, the government's witness testified that in November or December of 1997, Silva indicated his willingness to "kill ... again" and that "he loved Manny [Roman]." We hold that there was sufficient evidence to support the jury's finding that Silva failed

to meet his burden of demonstrating withdrawal from the conspiracy prior to November 1996.

Nor were the jury instructions on the question of withdrawal or abandonment from the conspiracy plain error. Although Silva argues that the instructions erroneously permitted a presumption of continuation, our case law permits such a presumption once the government has proven the existence of the conspiracy beyond a reasonable doubt. *See Spero,* 331 F.3d at 60.

### b. Hearsay Challenges

Because we reject Silva's argument that the government failed to prove his involvement in the conspiracy within the limitations period, Silva's assertion that certain testimony of Garcia and Serrano was improperly admitted as statements by coconspirators also lacks merit. *See* Fed. R.Evid. 801(d)(2)(E).

Silva also argues that the district court erroneously permitted two police officers to read from arrest reports and booking sheets under the recorded recollection exception to the hearsay rule. *See* Fed.R.Evid. 803(5). This argument is also unavailing. Before offering this evidence, the government established that (1) the officers' memory of the events detailed in the reports was sufficiently impaired; (2) they prepared or adopted the reports at or near the time of the events; and (3) at the time they prepared the reports, the reports correctly reflected their knowledge of the events. *See Parker v. Reda,* 327 F.3d 211, 213 (2d Cir.2003) (per curiam); *see also* Fed.R.Evid. 803(5). The district

---

3. The government's witness testified that Roman called Silva a "snitch" in 1997. Even assuming that Roman's "snitch" comments could provide sufficient evidence of withdrawal, abandonment, or expulsion from the conspiracy, Silva was required to demonstrate from Roman's comments in 1997 that

this expulsion occurred prior to November 1996. Although Silva asserted that Roman's statement was based on an incident that occurred in 1995, when Roman and Garcia suspected Silva of leading the police to their apartment, he offered little evidentiary support for this inference.

court's admissibility determination with respect to these witnesses was not an abuse of discretion. *See United States v. Tocco,* 135 F.3d 116, 127 (2d Cir.1998). In addition, because both police officers were witnesses subject to cross-examination by the defendants testifying about their own prior recollection of events, we find no violation of Silva's Confrontation Clause rights. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ....."); *see also Crawford v. Washington,* 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (stating Confrontation Clause rule applicable to "[t]estimonial statements of witnesses *absent from trial*") (emphasis added).

### c. Mandatory Life Sentence for Narcotics Conspiracy

Silva does not dispute that he was twice convicted for felony drug offenses in New York State, once in April 1990 and again in April 1998. However, he argues that the April 1998 conviction cannot be considered a second "prior conviction" for purposes of subjecting him to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) because the government presented no evidence that Silva committed any criminal conduct after April 1998.

For a particular conviction to be considered "prior" under § 841(b)(1),[4] "the government must demonstrate that a de-

fendant had a meaningful opportunity to refrain from criminal activity and instead engaged in criminality anew." *United States v. Martino,* 294 F.3d 346, 351 (2d Cir.2002). Although the government argues that it met this burden because Silva failed to demonstrate withdrawal from the narcotics conspiracy, and therefore he was presumptively engaged in criminal activity until that conspiracy allegedly terminated in 2002, there is a substantial question of whether a defendant's failure to prove the affirmative defense of withdrawal may satisfy the *government's* burden to demonstrate that the defendant engaged in criminal activity subsequent to a prior conviction.

■ However, because defense counsel did not present this challenge to the district court,[5] our review is only for plain error. *See United States v. Dukagjini,* 326 F.3d 45, 59 (2d Cir.2003). We find that, even if the district court erred in finding that Silva had two "prior convictions" for felony drug offenses and was therefore subject to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), this error did not affect Silva's substantial rights. In addition to and separate from the district court's conclusion that Silva was subject to a mandatory life sentence for his conviction on Count Eleven, the district court sentenced Silva to concurrent terms of life imprisonment for his conviction on Counts One, Two, Five, Six and

---

**4.** *Martino* concerned application of the mandatory sentencing provisions under § 841(b)(1)(B), while this case concerns application of the provisions under § 841(b)(1)(A). However, the meaning of whether a conviction constitutes a final "prior conviction for a felony drug offense" is the same under both provisions.

**5.** Defense counsel presented a different argument for why Silva should not be subject to a mandatory life sentence based on two prior felony drug convictions: that the New York

State convictions were "for conduct that the government proved were part of the charged conspiracy and that those sentences were imposed during the course of the conspiracy," and therefore "cannot be 'prior convictions.'" Counsel recognized, however, that *Martino* considered and rejected the same argument. He did not argue, as appellate counsel now does, that the April 1998 conviction was not a "prior conviction" because the government failed to demonstrate Silva's involvement in criminal activity after that date.

Seven. Because Silva was sentenced to multiple life sentences, any error by the district court with respect to § 841(b)(1)(A) was not prejudicial and did not affect the outcome of Silva's sentencing proceedings. *See United States v. Henry,* 325 F.3d 93, 101 (2d Cir.2003) ("[A]n erroneous sentence on one count of a multiple-count conviction does not affect a defendant's substantial rights where the total term of imprisonment remains unaffected.").

### d. Erroneous Jury Instructions

Silva argues that an element of the murder offenses under 21 U.S.C. § 848(e) is that the qualifying quantity of narcotics was "reasonably foreseeable" to the defendant and the district court erred in failing to instruct the jury on this point. He bases this argument on the fact that § 848(e) applies to the commission of intentional murder while engaged in an offense punishable under § 841(b)(1)(A), and the predicate narcotics offense was punishable under § 841(b)(1)(A) only if the qualifying quantity was reasonably foreseeable. *See United States v. Adams,* 448 F.3d 492, 499 (2d Cir.2006).

Reviewing the jury instructions as a whole, we find no grounds for reversal. *See Walsh,* 194 F.3d at 52 ("We will reverse only if the instructions, taken as a whole, caused the defendant prejudice."). The instructions made clear that a defendant could not be convicted of the § 848(e) murder offenses unless the jury found that that defendant "is guilty of conspiracy to distribute or possess with intent to distribute one kilogram or more of heroin," as charged in Count Eleven. And the district court's instructions on the narcotics conspiracy charge required the jury to find the drug-quantity element. *See Adams,* 448 F.3d at 499. The court stated that "a defendant may only be convicted if you

find beyond a reasonable doubt that he or she knowingly and willfully joined with co-conspirators in a conspiracy to distribute or possess either one kilogram or more of heroin and/or some quantity of cocaine." While the jury charge could have explicitly articulated the government's burden to prove that the drug type and quantity "were at least reasonably foreseeable to the co-conspirator defendant," *id.* at 499 (internal citation omitted), viewing the charge as a whole, we find that the district court's instructions adequately informed the jury of the relevant law. *See United States v. Males,* 459 F.3d 154, 156 (2d Cir.2006) (reviewing jury instructions "to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law") (internal quotation marks omitted).

### e. Substantial Independent Evidence of Silva's Confession to Killing "Tramp"

■ Silva asserts that the evidence was insufficient to support his conviction for the murder of Victor Rivera, aka Tramp, because the government failed to corroborate his purported confessions with substantial independent evidence of guilt. *See United States v. Bryce,* 208 F.3d 346, 354 (2d Cir.2000) (stating that the "modern corroboration rule requires only that there be substantial independent evidence which would tend to establish the trustworthiness of the statement." (internal quotation marks omitted)). Three government cooperators testified that Silva admitted to having murdered Tramp, and two of the cooperators gave reasonably detailed information about the circumstances surrounding the murder. Serrano stated that Silva told him about murdering Tramp around the time Roman issued a contract for the murder of a rival drug crew, because Silva was angry at Roman for paying him in installments rather than one lump sum.

We have suggested, albeit in *dicta*, that "statements made between co-conspirators to accomplish the ends of their criminal enterprise" are "self-corroborating." *United States v. Irving*, 452 F.3d 110, 118 (2d Cir.2006). However, Serrano also testified that on the night of the murder, Silva and Roman were talking for a while separately from other coconspirators; Silva did not go with the others to the Mark Anthony concert, but turned up later, after Serrano heard from another individual that Tramp had been killed. According to Serrano, Silva and Roman again engaged in a private conversation out of earshot of the others when Silva arrived at the concert. At the time of the murder, Roman and other members of the Hoe Avenue Crew suspected Tramp of robbing Roman, thereby suggesting motive for Roman to order Tramp's murder. In this context, we conclude that Silva's inculpatory statements were corroborated by substantial independent evidence of trustworthiness.

### f. Participation in the RICO Enterprise

■ Finally, Silva argues that the evidence was insufficient to demonstrate that he participated in the operation or management of the RICO enterprise, as required to convict him under 18 U.S.C. § 1962(c). *See Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (stating that conviction under § 1962(c) requires a showing that the defendant "participated in the operation or management of the enterprise itself"). Although the government acknowledges that Silva was a lower-rung participant in the heroin distribution enterprise, it asserts that Silva had "broad discretion" in carrying out his role as a hit-man, *see United States v. Diaz*, 176 F.3d 52, 92 (2d Cir.1999). We agree. The government presented evidence that Silva killed Tramp on his own, without the direct supervision of others, albeit apparently after conversations with Roman. In addition, Silva and two other individuals participated in the February 1994 double murder without specifically clearing it with Roman or receiving particular instructions as to how to execute the murder. Indeed, Serrano testified that Roman and Garcia did not pay Silva and the others the full promised amount for the double murders because they were unhappy with the manner and location of those murders. This testimony indicates that Silva and the two other individuals involved in the double murder were not simply "taking directions" and performing tasks as instructed. *See id.; see also United States v. Miller*, 116 F.3d 641, 673 (2d Cir.1997) (finding sufficient evidence of participation in the operation or management of the enterprise by body- and security-guards because they "had considerable responsibility for dealing with the [enterprise]'s perceived enemies").

For the foregoing reasons, we AFFIRM the judgment of the district court.